The opinion of the court was delivered by
Duncan, J.
The judgment was, “ that the defendant be placed in a ducking or cucking stool, and be plunged three times in the water.55 This sentence, we are informed, has created much ferment and excitement in the public mind. It is considered as a cruel, unusual, unnatural, and ludicrous judgment. But whatever prejudices may exist against it, still, if it be the law of the land, the court must pronounce judgment for it.
But, as it is revolting to humanity, and is of that description that only could have been invented in an age of barbarism, we ought to be well persuaded, either that it is the appropriate judgment of the common law, or is inflicted by some positive law; and that that common law or statutory provision has been adopted here, and is now in force. I have employed some time not very pleasantly, certainly not. very profitably, in tracing the punishment ad ludi-hrium to its source, and have followed this stream until it has sunk in oblivion in the general improvement of society, and the refor *226 mation of criminal punishment, and been dried up by Time, that great innovator.
It must strike all, as a peculiar feature of this offence, that it is of the feminine gender, that it degrades woman to a mere thing, to a nuisance, and does not consider her as a person. But this is not to be wondered at, when we reflect on the generally degraded state of woman, when this punishment was introduced. She was in some respects the servant or slave of the husband; so that he might correct her with a stick as thick as his own thumb. There is a tradition, that at the publication of Bracton’s learned work, in which the dimension of this instrument of correction was first stated, the women of the town in which he lived, seized him and ducked him in a horse pond. At the common law, women were denied the benefit of clergy, merely because their sex precluded them from holy orders, however learned they might be, while their more ignorant husbands, who eould yvith difficulty read even the neck verse, were burnt in the hand with a cold iron, for the offence for which they were doomed to die on the gallows. And female virtue, by the temporal law, stood and now stands in Eng~ land, exposed to the slanders and malignity of. falsehood; for any one in conversation, may proclaim the purest maid or chastest matron, as the most meretricious or incontinent of women, with impunity from the animadversion of the civil courts; and thus female honour, which is dearer to the sex than their lives, is left by the common law to be the sport of every malignant and abandoned calumniator. The learned Judge Blackstone seems to consider the female sex a great favourite of the law of England, yet his more just editor, Christian, in his notes, expresses a fear that there is little.cause to pay a compliment to our laws, for their favour and respect to the female sex. The right of the husband is to beat his wife, “ ex causa regiminis et castigationis.” It is true, he was only allowed — modicam castigationem adhibere, and this was never doubted until the polite reign of Charles II. Yet the lower rank of people, as Blaclcstone observes, who were always fond of, and adhered to the common law, still claim and exert their ancient.privileges; and the civil law allowed the husband a larger authority over his wife, permitting him for some misdemeanors, “ fiagellis et fustibus acriter verberare uxorem” — and if we add the present instance of partiality, that a scolding woman is to be ducked, while the most scandalously abusive and railing man goes unpunished, the iniquity and injustice will be very striking. ■ The ludicrous local customs of some of the manor courts, give us some idea of the low grade in which women were placed. The widow, to redeem her free bench, rode into the steward’s court, sitting upon a ram with the tail in her hand, repeating some ribald verses:—
f1 Here I am, riding on a black ram, &c.5’
*227 The punishment of the ducking, or cucking stool, is from the cuckoo, “ qui odiose jurgat et rixatur, ” as Lord Coke has it, in 3d Inst. 219; or, as Jacobs has it, in his Dictionary, the gogen stool, and by some thought to be corrupted from the choke stool; and the instrument is called in Stat. 51, Hen. 3, a trebueket, a pitfall, and in law, as Lord Coke says, signifies, a stool that falls into a pit of water; whereas the last instrument that was seen in England, as Morgan, an editor of Jacobs’ Dictionary mentions, consisted of a beam or rafter, moving on a fulcrum, and extending to the centre of a large pond, on which end the stool used to be placed; while, on the other hand, Daines Barrington, a learned antiquarian, in his observations on the Statutes, 40, says, it is a machine anciently used in the siege of towns, and the etymology is from the Celtic tre, that is, ville, and our own bucket, and signifies a town bucket. Thus, in our very outset, we are involved in doubt, and who shall decide, where there is such a difference among the learned ? The officer would not know what to do, whether to fix Nancy James on a stool or in a bucket, whether she is to be run into the river on wheels, or to be soused into a pond, from a beam or rafter. From the country from which it is suggested we have borrowed it, we could obtain no information, nor expect a model, for not a vestige of it is there to be found; unless, perhaps, along side of the Rack, (the Duke of Exeter’s daughter,) which is still shown as a curiosity by a yeoman of the King’s guard, as an instrument of punishment, which, like the trebueket, was once used in England, (Barrington, 366,) for no poor woman in that country has suffered under the edge of a law so barbarous, for the last century — like unscoured armour, it is hung up by the wall— like the law of witchcraft, it has remained unused; for no one has suffered under that law, either at the stake or on the gibbet, since the reign of Charles II.; although the law stood unrepealed on the Statute Book, until 9th Geo. 2., as our own law against the same of-fence, until several years after the revolution; or, like the act against the gypsies, which punished those with death, without the benefit of clergy, who remained one month within the realm; and Lord Hale, in his Pleas of the Crown, 671, says, “I have not known these statutes much putin execution, only about twenty years since, at the Assizes at Bury, about thirteen were condemned and executed for this offence.” On this judgment, BlacJcstone, 4th vol. 166, remarks, “but to the honour of our national humanity, there are no instances more modern.” Thus we see two bloody statutes repealed by the voice of humanity, and not by positive law; so that it seems most probable that hanging of women as witches and gypsies, and ducking them as scolds, ceased about the same time, viz. the time of the restoration, and before the charter to William Penn. Yet it is to be remarked, that the statute of 6 Jac. 1, against witchcraft was adopted in Pennsylvania, and ordered to be duly put in force and execution; and in the first address of the elder Mr. *228 Ptaible to the associated members of the Philadelphia bar, (which is only the proeme of a work of general interest on the civil insti1-tutions of this state from its earliest day; and from the great learning and deep research of that eminent lawyer, we may justly look for a work of vast utility to all employed in the practice or in the administration of the law,) we have the record of a trial for witchcraft before the governor and cduncil; in which there was a verdict either of great simplicity or of deep policy, to get rid of a most insane prosecution for an impossible crime; without acting in open hostility to the deep rooted prejudices of the day. The jury find “ that Mary Mattser is guilty of having the common fame, of being a witch;” Indeed, it appears that at the same period; the race of witches and scolds became extinct; when the law ceased to hang the witche.s and duck the scolds. The instances are numerous of statutes being repealed in fact~a kind of silent legislation. As to the abrogation of statutes by “non user,” there may rest some doubt; for myself, I own my opinion is, that “ non user” may be such as to render them obsolete, when their objects vanish or their reason ceases. The common law (and this is but a customary punishment) wliat is it, but common usage? The long disuetude of any law ¿mounts to its repeal. Mr. Woodeson-, in his second lecture, (vol. 1st, 63,) of civil positive and instituted laws, observes si that the last consideration is the peridd of their existence.” They may be repealed either expressly or by implication founded on disuse. He cites this passage from the Digest, — rectissinie il-lud receptum est — ut magis non solus suffragio legislatorum; sed etiam tácito consensu omnium per desuetudinem abroga-tur.” It certainly requires very strong grounds to- presume a law obsolete, yet as the whole community includes as well the legislative power as its subjects, total disuse of any civil institution for ages past, may afford just and rational objections against disrespected and superannuated ordinances. Judge Wilson, (2d Wilson's Works, 38, 39,) observes, “ that it is the characteristic of a system of common law, that it may be accommodated to the circumstances, the exigencies, and the conveniences of the people b.y whom it is appointed. Now, as these circumstances; exigencies; ¿nd conveniences silently change, a proportionate change in time and in degree must take place in the accommodated system; Time silently and gradually introduces, it silently and gradually withdraws its customary laws.” What was the criminal punishment in conspiracy, the villainous judgment, viz. to lose the illiberam legem,” wheréby they are discredited as jurors or witnesses, to forfeit their goods and chattels and lands for life, 't.o have their fields wasted, houses razed, their trees rooted up, their own bodies committed to prison. But this villainous judgment; by long disuse, has become obsolete, it not having been pronounced for ages; but instead thereof, the delinquents are usually condemned to fine and imprisonment, or the pillory, (4 Blackstone; *229 136.) The barbarous writ of attaint, which has as strong a foundation as any principle in common law, has been long banished. That such crimes and punishments existed at the common law, every treatise to the present day states — but this does not prove that they now exist. They are nothing more than the memorials of times that are past, as the usages of our uncivilized ancestors; and in nothing is the gradual change of the common law more apparent, and in nothing does it accommodate itself more to the change of manners and effect of education; than in the silent and gradual disuse of bar- . barous criminal punishments. Lambert, who first published his Treatise on the Office of Justice of the Peace, in 1610, lib. i. c. 12, states that corporal punishments are either capital, or not capital; that capital are inflicted “sundrie ways; as by hanging, burning, boiling, pressing: not capital are of divers sorts, as cutting off the. hand or ear, burning or branding the hand, face; shoulders; whipping, i mprisoning, stocking, sitting in the pillory, or on the cucking stool.,r Of this kind of punishment, our old laws had more sorts than we now have; as pulling out the tongue for false rumours, cutting off the nose, and, for adultery; taking away the privy parts. So they had more sorts of punishments, when Lambert wrote, than we now-have. Blessed be God! 1 feel a conviction, (and I have examined every book upon which I could lay my hands-,) that there is no judicial record-, certainly no report, of this punishment being inflicted for more than one hundred years. The case in 2 Strange, 849, The King v. Taylor, was quashed generally; it Was not against her as communis vcxatrix, but as calumniatrix, et communis perturbatrix; and, in The King v. Margaret Cooper, Id. 1246, the judgment was not rendered as for a common scold; and the last of them was as long ago as 19th Geo. 2, nearly eighty years ago. In The Queen v. Foxby, 6 Mod. 11, in the second of JJnne, the judgment was likewise arrested for mistake in the indictment. The note of the reporter is, the punishment of a scold is ducking, but the counsel for the prisoner said, “he knew no law for ducking of scolds.5’ Lord Holt did not give any opinion as to the judgment; he only mentioned that it was indictable in the Leetsi, “ and that it was better ducking in a Trinity, than a Michael . mas term55 — better in warm than in cold weather. But it was too much even for the gravity of the grave and learned Chief Justice of the King’s Bench, to treat the subject with any solemnity. In page 178, she was brought up again, (for the sheriff had let her go at large,) and the court let her run again until the next term. Holt could not conceal his contempt for this farce of ducking; he sneered at the “trebucket; declaring that ducking would only harden the criminal; and; if she were once ducked, she would scold all the days of her life. I think that the trebucket then, made its final exit, or afterwards was only heard of in courts of justice, as John Doe and Richard Roe, pledges of prosecutionpa mere nominal thing. Judge Wilson, certainly a learned and eminent person, *230 to whom the state committed the revision of her laws, in his third volume, page 311, treats the trebucket with the same contempt with which Lord Hoet had done before him. After giving the judgment against a common scold, in a public lecture, he sneeringly says — {£So she shall be plunged into the water by way of punishment and prevention;” and thus scornfully winds up the trebucket — “ Our modern men of gallantry would not surely decline the honour of her company; I therefore humbly propose, that in future, the cucking stool shall be made to hold double.” And those only who knew that great man, can form an idea what that look of scorn was.
This cucking stool was a species of the tumbrellum; — Lord Coke laments that there was no good Latin word for the dung eart, and says, that the pillory and the trebucket were of the dung eart family. By the statute 51 Hen. 1., the pillory is the appropriate punishment for the bakers who broke the assize of bread, and the punishment of brocatrix, or a she brewer, is the trebucket. Barrington, St. 40.
Now, I ask, with as much gravity as I can command, if Mrs. Thrale, the widow of the great brewer Thrale, the rich, learned, accomplished, and fashionable Mrs. Thrale, had not put sufficient malt in her liquor, if she should be exposed to the punishment of the cucking stool, and be ducked in stinking water; or if the celebrated Dr. Johnson, the leviathan of learning, the executor of Mr. ThroWs will, had broken the assize, if the pillory would have been his punishment? for I think we are informed by Mr. Bos-tvell, that he saw him in the brewery, attending to its concerns, and bustling about, with his ink-horn tied to the button of his coat: or would he be ducked in stercore, for Jacobs, in his Dictionary, informs us, the trebucket was a punishment for brewers and bakers, who were ducked in stercore, or in stinking water; and we must never forget, that the law professes equality of punishment; that the common law, which stamps freedom and equality upon all who are subject to it, which protects and punishes with an equal hand the high and the low, the proud and the humble, I say professes, for in the trebucket punishment we shall presently see, that it was never intended for the rich, and never was inflicted on beauty and youth. These scolds were indictable in the sheriff’s tourn— in terms de la ley, this is the definition: “a cucking stool is an engine, invented for the punishment of scolding and unquiet women, and by the judgment in Eyre, in the time of Edward III., a pillory and a tumbrel were appendant to a leet, without which right cannot be administered within the view.” Very possibly, as both men and women were in those days rude and disorderly, the women were put in the trebucket and the men in the pillory, for disturbing or making a noise in this great court; and Lord Coke, Inst. 219, says, “furca, pillare et tumbrel appendant al view de frank pledge, and every one who hath a leet or market, ought to *231 have a pillory and trebucket to punish offenders; for want whereof, the lord may be fined, or his liberty seized.” And this is something like the heritable jurisdiction in Scotland, only that was more extensive; for it added to the pillory and the tumbrel, the gallows. There is no ground, whatever may be the antiquated theory of the law, that it now exists in fact and in practice, as a legal punishment. Barrington says, it was a punishment formerly used in this country for female offenders, and not confined to the offence of scolding; and Jacobs says the punishment is disused. Mr. Morgan, one of his editors, informs us, that he saw the remains of one on a private estate in Warwickshire; and Mr. Tomlins, in his last edition of this work, mentions there had been one, which had lately been removed, at Banbury, in Oxfordshire, but that was not a machine for legal punishment, but was used to make sport for the mob, in ducking common women; for this usage, this propensity to ducking women, was pretty inveterate. Old women were generally ducked by the common people, by way of primary or experimental trial, before they were delivered over to the civil magistrate to be hanged as witches. Many of the accused died under the experiment. This does not depend on a work of fictioy, (many of which, in the present day, present the real manners and habits of the times in which they lay the scenes,) but on authentic history.
I do not know that all the members of the court agree with me in the conclusion, as to the abrogation of this punishment in England by disuse; but in the inquiry most important, there is no difference of opinion. We all agree in this, that this customary ancient punishment for ducking scolds was never adopted, and therefore is not the common law of Pennsylvania.
It has been already stated, that the ducking stool, cueking stool, or choaking stool, (quocunque nomine gaudet,) and the pillory, the collisstrigium, or neck stretch, are punishments, ejusdem ge-neris, of the same family, of the dung cart race — and were intended, magis ad ludibrium, quam in jnenam. Barrington, 41, 63. In The King v. Beardmore, Mr. Justice Dennison says, “ that standing with the head in the pillory is by way of disgrace, ad ludibrium, which is the intent of this kind of punishment;” and it is very certain, that the legislature never considered the ducking stool a legal punishment, which could be inflicted by the sentence of the law, or when they abolished the pillory and whipping post, &e. they would have included it. The object of the framers of the act of 1790, was the abolition of all infamous, disgraceful public punishments — all cruel and unnatural punishments — for all the classes of minor offences and misdemeanors, to which they had been before applied. This was the object of the author of our humane penal code. I need not mention the name of Mr. Bradford, to whom the civilized world is so much indebted; and the wisdom, humanity, and policy of our Pennsylvania plan, has crossed the Atlantic — England, attached as she is to her own system, has *232 stlopted ours; arid very lately, by stat. 56 Geo. 3., has abolished pillory, in all cases but perjury and subornation of perjury. Long before to the honour of her humanity, in the case of punishments inflicted for clergiable offences, she had extended the benefit of clergy to women, provided that the whipping should be in private, and in the presence of the female sex alone, 19 Geo. 2. c. 26; and I believe the punishment of whipping, as to females, has been altogether abolished. The late Judge Ingeksoll, a name respected and honoured, when attorney general, in his report to the legislature in 1813, stated, that by several acts of assembly, “cruel and unnatural punishments, which tended only to harden and confirm the criminal, had been abolished for all inferior offences.’-’ It is apparent that those two distinguished men were of opinion, that all infamous corporal punishments, and disgraceful public spectacles, ad ludibrium, were abolished; and that the legislature so considered it when they passed the several acts, reforming the penal laws, I think we have the most conclusive evidence. The sanguinary code of England could be no favourite with William Penn and,his followers, who fled from persecution. Cruel punishments were not likely to be introduced by a society who denied the right to touch the life o? man, even for the most atrocious crime. For had they brought with them the whole body of the British criminal law, then we should have had the appeal of death, and the impious spectacle of a trial by battle in a Quaker colony; and it is worthy of remembrance, that the charter of William Penn empowered him, with the advice and assent of the freemen, to make laws for their own government, and until this was done, the laws of England, in respect to real and personal property,and as to felonies, were to continue the same. Thus, as to misdemeanors, the common law punishments were not brought over by the first settlers. The first body of laws, (called the great body of laws,) contains an act -passed in 1682, against scolding, imposing the penalty five shillings, pr three days’ confinement at hard labour. (Chap. 34.) The second act, in 1683, (ch.ap. 12,) inflicts the same penalty, or standing one hour in the most public place, -with a gag in the mouth; and, eleven years after this, in 1693, in the petition of right to Governor 'Fletcher, they state that the laws contained in that list had not been repealed by the King in council, and that it had pleased the .King and Queen so tenderly to regard their happy government, as to confirm their own laws and constitutions, so fitly accommodated to their circumstances, and conclude by earnestly desiring him to govern them according to these laws, including the laws against scolding; and the governor commanded them to be enforced. These acts certainly continued in force until 1770, when another act against scolding passed, inflicting the same penalty, of imprisonment five days at hard labour, or to be gagged and stand at some convenient place, at the discretion of the magistrate. These acts are not in the printed laws, but wpre procured by me from the se *233 cretary’s office. The act of 1770 was repealed by the Queen in council, but I have not been able to find the repeal of the acts of 1683 and 1683. It seems to have been the opinion of the late Judge BRADFORD, that all in the great body of laws was repealed, and I would not venture totally to dissent from so high an authority, though I must confess I think this very doubtful. Nor do I see how, consistently with the charter, this could otherwise be repealed, than by act of assembly. If they were not directly repealed, they were not virtually repealed by the repeal of the act of 1700. Certain of these laws were enforced by indictment in 1685, as appears in Hall’s Journal of Jurisprudence, (1st vol. No. III. p. 324.) One Eambo was tried and convicted of fornication, and enjoined to marry the woman he had seduced, or pay a fine of ten pounds. The law7 of 1700 differed in some respects; its repeal left the others in full force. Because the people did not obtain a sanction from the crown to the act of 1700, it by no means followed that they were deprived of the former laws, and the common law forced on them. Mr. Smith, in his edition of the laws, gives us the heads of the several laws contained in the great body of laws, including these two, and adds this note: — “Most of these laws mentioned in the foregoing list, were subsequently supplied; the remainder became obsolete.” Whatever be the fact, the conclusion is the same, — th’at the common law punishment of ducking was not received nor embodied l>v usage, so as to become apart of the common law of Pennsylvania. It was rejected, as not accommodated to the circumstances of the country, and against all the notions of punishment entertained by this primitive and humane community; and, though they adopted the common law doctrines as to inferior offences, yet they did not follow their punishments. One remarkable instance I will notice. A gross libel in England was sometimes punished by the pillory: I believe Mr. Prynne lost both his ears. Though the offence is the same here, yet the sentence is very different. It is not true, that our ancestors brought with them all the common law offences; for instance, that of chain-party and maintenance, this court decided in Stoever v. Whitman’s Lessee, 6 Binn. 416, did not exist here. I do not find the rule on this subject more satisfactorily laid down any where, than by the Chief Justice, in The Guardians of the Poor of Philadelphia v. Greene, 5 Binn. 558. Every country, he observed, had its common law — ours is composed partly of the common law of England, and partly of our own usages. Our ancestors, when they emigrated, took with them such of the English principles as were convenient for the situation in which they were about to place themselves. By degrees, as circumstances demanded, we adopted the English usages, or lubstihjtod ethers better suited to our wants; until before the revolution, we had formed a system of our own, founded in general on the English constitution, but not without considerable variation; and in nothing was the variation *234 greater, than in the trial and punishment of crimes. Judge Chase, in The United States v. Worrall, 2 Dall. 384, on the same subject, thus expresses himself: “When th eJlmerican colonies were first settled by our ancestors, it was held, as well among the settlers as by the judges and lawyers of England, that they brought hither, as their birthright and inheritance, so much of the common law as was applicable to their local situation and change of circumstances; but each colony judged for itself what part of the common law was applicable to its new condition, and by various modes, by legislative acts, by judicial decisions, or by constant usage, adopted some parts and rejected others.” Here all our legislation has been opposed to this punishment — judicial decisions there are none. I cannot give to the two precedents from the Quarter Sessions of Philadelphia, the weight of decisions. In Winn’s Dialogues, (Eunomus,) there is a scale given, by which the weight of legal precedents may be measured. Precedents sub silentio would obtain the lowest place. Next above these, (though in comparison the first are almost as the freezing point in the thermometer to the spring temperature,) I consider an opinion of a judge at nisi prius; the determination of any court in Westminster Hall much higher than this; that very determination confirmed by another court on writ of error; and the highest of all, the determination of the same in a court of last resort. The two instances in the Quarter Sessions, which are principally relied upon to sustain the judgment, are too slight a foundation on which to rest a sentence, so hostile to all the policy and humanity of our penal code, and so much opposed to the sense of the community. Common law rights are to be found in the opinions of lawyers delivered by axioms; or inju-dicial decisions, well considered and established; or to bo collected from the universal usage through the country. What is the evidence here? In 1769, eighty years after the settlement of the colony, in The King v. Mary Conway, the indictment was against her as a common scold: she pleaded guilty. The sentence was, that she should be publicly ducked at the end of Market street wharf, in the Delaware. All this passed without debate, and, we may presume, without the assistance of counsel for the woman. In 1779, ten years after, there was a trial and conviction—The State v. Ann Maize—and the same sentence. In 1781, there was an indictment for the same offence, against Mary Swann—verdict, guilty; continued for advisement; continued from March, 1781, to June, 1782, when there is this most extraordinary entry: — “ Defendant having demeaned herself peaceably, kept under further advisement; and, in the next term, on motion of Mr. Bankson, the defendant was recognised, that she will, within, one month, leave the neighbourhood and pay the costs.” The highly respectable court, whose decision we are now revising, were probably governed by these precedents, considering them exclusive evidence of the adoption of this punishment, and making *235 it the law of the land. And I am satisfied that it will afford to every member of it great satisfaction to have the error corrected, in a judgment which they most conscientiously, and, as we are informed, most reluctantly gave, having first called upon the defendant’s counsel to suggest any reason why it should not be given; and, when it was given, recommending a writ of err.or, and humanely suspending the execution of the sentence, until the opinion of this court should be taken: — the entry in the last case overturning every thing like proving a settled usage. Why this long delay? Why enter into a compromise with the woman? Why dispense with the judgment of the law? Because they were doubtful of the sentence to be given; therefore they were glad, as well as the neighbourhood, to get rid of her. Mr. Bradford, was then Attorney General — most probably, all was transacted under his advice — we can thus readily account for this unusual judgment. The Court of Quarter Sessions was, when this judgment was given, composed entirely of men who, (however high their standing in society, and however intelligent,) were unversed in law. Since 1782, until the last case in the Mayor’s Court, forty years ran round, and there has been no instance of this punishment. There has been one of an acquittal. That case, therefore, proves nothing.
This is a very different question from the common law rules of real and personal property, — the modes of acquisition and alienation of estates. For although the reasons of many of those rules have ceased, yet it might be dangerous, on that account, to abolish them; as it would lessen the security of property, of titles to land, which should always be firm and stable; and, by the charter, they were to remain the same as in England, except when altered by the representatives of the people. But I am far from professing the same reverence for all the degrading and ludicrous punishments of the early days of the common law — I am far from thinking that this is an unbroken pillar of the common law, or that to remove this rubbish, would impair a structure, which no man can admire more than I do. But I must confess, I am not so idolatrous a worshipper as to tie myself to the tail of this dung-cart of the common law. In coming to the conclusion, that the ducking stool is not the punishment of scolds, I do not take into consideration the humane provisions of the constitution of the United States and of this state, as to cruel and unusual punishments, further than they show the sense of the whole community. If the reformation of the culprit, and prevention of the crime, be the just foundation and objects of all punishments, nothing could be further removed from these salutary ends, than the infliction in question. It destroys all personal respect — the women thus punished, would scold on for life, and the exhibition would be far from being beneficial to the spectators. What a spectacle would it exhibit! What a congregation of the idle and disorderly, of black and white spirits! and the day would produce more scolding, in this polite city, than would otherwise *236 take place in a year. . The city is rescued from this ignominious and odious show, and the state from the opprobrium of the continuance of so barbarous an institution; which would pluck from the brow of our legislators, that diadem of humanity, Which the civilized world has awarded. Tho courts of our sister states of New York and Massachusetts, governed by the same common law as we are, have declared that this strange and ludicrous punishment no longer exists with them. Although I admire the impartiality of the first laws against scolding, confirmed by Governor Fletcher, in the punishment of men and women equally, as the offence (if it be an indictable one, or within the control of human laws,) would be common to both sexes — yet I cannot applaud their justice or equality, in a country where all are born equally free and independent, and where there is no distinction of ranks; for it is only the poor who are to bo gagged — a woman was not gagged for scolding, but because she was so very poor as not to be able to raise five shillings. Rut this was treading in the steps of ancient legislatures, which punished the peccant member, and commuted the offence for money; and it was following the principle of the tumbril law, which was a punishment and a disgrace, fixed on the poor only; for Lord Coke, in his chapter on the trebuckel, says, (3 Inst. 220,) “ Nobiles magis pled uni ur pecunia, plebii vero in cor-pore
In considering this question, I own, I have some hesitation in deciding whether the offence .of communis veosalrix exists as indictable, but I have acceded to the opinion of the Chief Justice and my brother GxbsoN; it now is to be considered as indictable and punishable as a common nuisance, by fine, or by fine and imprisonment, at Ihe discretion of tho court, the acts of assembly being obsolete, and the common law punishment of ducking, not being received here; and I join in the hope of a learned antiquarian and jurist of our own country, “ that we shall hereafter hear nothing of tho ducking stool, or other remains of the customs of barbarous ages.” Duponccau on Jurisdiction, 86. It is therefore the opinion of the court, (hat the judgment of the Court of Quarter Sessions be reversed.
Judgment reversed.
Note. — So late as the 22d of Hen. 8. an act passed for the punishment of one House-, a cook, who had poisoned seventeen persons of the family of the Bishop of .Rochester, two of whom died. By an ox post facto law, this was made treason, and he was ordered to be thrown into boiling water; the idea of which punishment, as Barrington suggests, was because he was a cook. Bar. 366. Such were the barbarous institutions of the age. This punishment accorded with the savage cruelty of the monarch, and was recommended by its quaintness — to boil a cook was quite a royal joke; as the Duke of Clarence %vas drowned in a butt of Malmsey, a favour granted him by the King; a whimsical choice, says Hume, which implied, that lie liad an extraordinary passion for that liquor.