### IN THE

## SUPREME COURT OF THE STATE OF GEORGIA,

## AT AUGUSTA,

### JUNE TERM, 1852.

Present—JOSEPH H. LUMPKIN, } Judges.*
HIRAM WARNER,

No. 52.—JAMES CAMPBELL, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant.

[1.] While the amendments to the Constitution of the United States were *primarily* intended to be restrictive upon the powers of the General Government, and not the Legislatures of the several States—yet they are "*declaratory*" of great principles of civil liberty, which neither the national nor the State governments can infringe.

[2.] The 6th article of the amendments to the Constitution of the United States, providing that "in all criminal prosecutions, the accused shall be confronted with the witnesses against him," is not contravened by the admission in evidence of the *dying declarations* of the deceased, in the trial of a prisoner charged with the homicide.

[3.] In order to make *dying declarations* admissible in evidence, the deceased must not only be actually *in extremis*, but he must believe that he is in a dying condition. And this consciousness may be inferred, not only from the statements of the party, but also from the nature of the wound, and other circumstances.

[4.] When a *prima facie* case is made out, the evidence should be submitted

---

*NOTE.—Judge NISBET was detained at home by the severe illness of his wife.

to the Jury, it being an *issue of fact,* whether or not the declarations were made in immediate prospect of death.

[5.] Where the evidence is contradictory as to whether or not the declarations were made with the consciousness that the declarant was *in articulo mortis,* the Court will not interfere with the verdict of the Jury and grant a new trial, especially where it is satisfied that the finding was warranted by the proof.

Indictment for murder, verdict for manslaughter, and motion for new trial, in Richmond Superior Court. Tried before Judge STARNES, January Term, 1852.

James Campbell was placed upon his trial upon an indictment charging him with the murder of Alfred Mays.

Upon the trial, the following evidence was given in before the Jury.

### Testimony for the State.

John Evans, (sworn.) I knew Alfred Mays ; I saw him last in January, 1851—think it was about the 23d—it was in this County. He seemed in a bad condition from wounds. I did not see the wounds then. I saw him dead ; I think he died on Tuesday morning. When I got there on Tuesday morning, he was dead ; I saw him alive on the evening before. Mays made these declarations in expectation of soon dying.

(Cross.) Mays said he should die, several times ; said so when I first saw him. I was with him a great deal. Mays was a married man—he had a family—had three young children—think they were there. I was there three hours or more at a time. Last time, while he was alive, I stayed two or three hours ; left about 12 ; he was talking about dying ; said he should die— that he could not possibly stand it. He did not call his children around him ; he said nothing to his children about his going to die and leave them.

(By Court.) From Sunday evening to Monday evening, at my visits, I heard these statements.

(By State.) About sun-rise, Tuesday morning, I returned and found him dead.

Campbell *vs.* The State of Georgia.

John M. Galt, (sworn.) Alfred Mays was brought to my office Sunday morning, 20th January, 1851. I found him extremely prostrated, from exposure to cold and several wounds. He had a wound on his back, just below the shoulder-blade, which was a flesh-wound—one on the chest, also a flesh-wound, and one on the abdomen, which penetrated the cavity—it was on the left side, above the hip—it was of the breadth of two inches, and depth of one—it was inflicted with a sharp instrument. It was in this County. There were other wounds—several superficial ones on the lower part of the spine, and about the knee. I am a practising physician. I saw him the next morning, about 11 o'clock; he had a blow across the right ear, I think. I did not regard either of the wounds as necessarily mortal. But for exposure to the cold, he would not, I think, have died; no vital organs were injured; the loss of blood was not great; a portion of the membrane of the intestines protruded from the abdomen. I saw him Monday, he was suffering intense pain. I was sent for on Tuesday morning—when I got there, he was dead. Had no conversation with him relative to his dying. Think he died from wounds with subsequent exposure. Did not hear him express apprehension of death.

(Cross.) I could not judge whether he had been intoxicated or not. Don't recollect his asking me if I thought he would die. I never would have thought the wounds were sufficient to kill him. I believed he was under the influence of liquor, from the fact, that not one of the wounds would prevent his walking when he received them. I was asked if I thought he would die, by several; I never expressed the opinion that he would die. I do not know whether he could have got the blow on the head by a fall or not.

(By State.) Think the bruise was on the right side.

(By Court.) Though the prisoner might have walked, yet it is possible the blow might have prevented him from walking until his system grew torpid from effect of cold. I think the concussion produced by cold, would with liquor, have kept him still until overcome by cold.

(By Prisoner.)   I think the blow and loss of blood were suf. ficient to prostrate him, if drunk.

John J. R. Flournoy, (sworn.)   I saw Alfred Mays one or two days before his death—think it was on Monday evening, about 4 o'clock.   He was in bed—very weak—very much depressed in feeling.   He said what caused his injuries.   I was there but a short time.   He stated that certain persons who had inflicted the wounds had threatened to kill him—that they had done it, or very nearly done it—naming the persons.   Think he made no further expressions with regard to his fate.   No one was weeping around him.

William Goodwin, (sworn.)   I knew Alfred Mays.   I saw him last on Monday after he was hurt; think it was in January, 1851, just before he died.   Saw him on Sunday and Monday evenings; got there Monday about 11 o'clock, A. M., and left about 2 P. M.   He was in bed; he seemed in great pain; he said so; he said he would never get over it.   Don't recollect his saying what should be done after his death.   He seemed in low spirits.

(Cross.)   Do not know whether men are depressed when getting over a spree.

John Evans, (recalled by State.)   When I went into the house on Sunday evening, I asked Mays how he was, and he replied that he was very bad off; he said he was cut all to pieces, and he believed he should die.   I told him I was in hopes not.   I asked him who it was that wounded him?   He said, James Campbell and James Ratcliff.   It was done on Saturday night, in this County, from what he told me.

[It is admitted that the assault was committed in this County, at the time charged in the indictment.]

He said that Campbell came up and struck him first, with a stick.   He said he whirled and knocked Campbell down.   Said that Ratcliff struck him with a stick, a blow that nearly knocked him down, and before he could recover, Campbell was cutting him with a knife and Ratcliff beating him with a stick.   He said it was at night; they cut him down, and he cried out to them not to kill him; he halloed murder; they still kept beating and cut-

ting him while he was down.   When they left him, they said, " now God damn you, if that hain't fixed you, you shall be fixed, or will be fixed."   Mays was well acquainted with Campbell and Ratcliff.

(Cross.)   I was well acquainted with Mays.   In that conversation, I asked Mays if he was drunk?—he replied, " you know how I have been when I have taken a drink or two."   He did not state how he got to fighting.   I never was unfriendly with Campbell and Ratcliff.   I believe, that in a drunken spree at Jason Watkins', four or five years ago, I did have a difficulty with James Campbell.

John J. R. Flournoy, (recalled by State.)   When there, on Monday, about 4 o'clock, P. M. as I before stated, I found Mays very much depressed, confined to his bed ; I asked him who had inflicted the wounds?—he replied, James Ratcliff and the prisoner at the bar, James Campbell ; he told me, I think, that he was walking between Campbell and Ratcliff—Campbell on his right side and Ratcliff on his left—that Campbell rather dropped behind him, and gave him a blow with a stick on the right side of his head ; he turned to return the blow, on Campbell, and Ratcliff struck him.   The fight continued with sticks and knives until he found he must be overpowered, when he cried to them not to kill him, and fell.   Did not say who had the stick or who had the knife.   When this was stated, Mr. Evans was not present.   In reply to my inquiry, why he did not use his knife, he said he did not think it necessary.

(Cross.)   He did not state in relation to death, more than what I have stated.   He did not intimate when he thought he would die.

William Goodwin, (recalled by State.)   I was at Mays' on Monday, between 11 and 12 o'clock in the day—stayed there two or three hours.   Mays said he was cut all to pieces ; he said, in reply to my inquiry, who did it? Mr. Ratcliff and the prisoner at the bar, James Campbell.   He said that he never would get over it ; he said he and Campbell were walking together, he received a blow, as he thought, from Campbell ; that he whirled around and knocked Campbell down, and before he could recover, he received a blow from a stick across the right side of

his head, which staggered him, and before he could recover, Mr. Campbell was cutting him with a knife. He said, Mr. Ratcliff gave the second blow—that he cried out to spare life, if possible. I was not present when Mr. Flournoy and Mr. Evans were there.

(Cross.) He said it was between 8 or 9 o'clock. I might have been there two hours on Sunday morning, and about two hours on Monday. He said nothing about what was to become of his property or family when he was dead. He said he wanted Mr. Evans to attend to have these people arrested, if he died.

(By State.) Mays said he was assaulted near Mrs. Reid's gate, on the Sand hills—old Mrs. Read's, David Read's widow. That place is 100 or 150 yards from a house.

(By Prisoner.) Mrs. Campbell's is, perhaps, a mile and a quarter from the gate—don't think it is two miles.

(By State.) Mays is a man of very little property.

Samuel Read, (sworn.) I think I last saw Mr. Mays on Saturday night, between 7 and 8 o'clock, before he died, at the bridge just below the Sand-hills. Campbell was with him. Stephen Bass was along at the time. They were quarrelling a little; Campbell and Mays were both talking; they were going towards Mrs. Read's. Mays asked Campbell to go and take a drink. It was about a half a m·le from Mrs. Read's. After they drank, I thought it was all over. They walked back towards Mr. Watkins' and I saw no more of them. Mrs. Read's gate lies in Mays' and Campbell's route home. That was pretty much Mays' road, after leaving the bridge, first came to Mrs. Campbell's.

(Cross.) I testified before the examining Court. I don't think Mays was drunk—think he was drinking—I heard Campbell say nothing out of the way. Mays seemed to be mad— he cursed some ; he had a jug of liquor with him ; he asked me to drink ; I did not drink ; he went to drink—I saw them take the jug; he was a little intoxicated.

(By State.) The road on which the difficulty happened is a public road, leading from town.

Seaborn Skinner, (sworn.) On Monday before his death, I

saw Mays; I called on him—I asked him how it happened? He said, Saturday night before, he and James Campbell were coming up from Battle Row; that about the time he got between Mrs. Read's and Jesse Ansley's, he felt some person strike him; that he turned and it was Mr. Campbell; he drew back and knocked him down—before he turned round, James Ratcliff struck him with a stick and staggered him; before he recovered, Campbell commenced cutting him with a knife, and Ratcliff beating him with a stick. He said that after they had beaten him as long as they wanted to, they left him in the road till next morning. None of the witnesses who have testified, heard this statement, as I remember. He told me he thought he would die; he told me, when I bid him good-bye, that he never expected to see me in this world, and asked me to pray for him. I am a member of the Church.

(Cross.) I was there about half an hour. Said nothing about business or his family when speaking of death. Mays was a member of the Church I belonged to; he was turned out. I was not sent for. Mays had not been in family. I belong to the Methodist Church—I am class-leader.

(By State.) I left Mays' house Monday, between 11 and 12 o'clock.

(By Court.) I don't recollect where Mays said they came from, but that he and Campbell were coming up together, when they fell in with Ratcliff. Ratcliff was there when Campbell struck him.

Wilson Watkins, (sworn.) I saw Mays Sunday before his death, lying before Mrs. Read's gate; he was covered up with leaves; it was very cold; I uncovered him and asked him what was the matter? He said, he was cut all to pieces. I saw one wound on his left side. There was a great deal of blood under his left arm. It was tolerably soon in the morning. I believe that he had been lying there nearly all night, from the appearance of the place; blood had soaked in the sand. Did not examine his garments.

(Cross.) He said, Jim Campbell cut him; he said nothing about Ratcliff.

(By Court.)   He said little boys covered him with leaves.

(By Prisoner.)   After my brother came up to him, he (my brother) asked him, and he said he suspicioned Jim Campbell.

(By State.)   He did not speak of Ratcliff; he seemed pretty bad off; talked very little.

(By Court.)   He sent Mr. Cumming's negro to let me know he was there.   He got the negro to cover him.

(By State.)   I carried him to Dr. Gault's.

### Testimony for the Prisoner.

James Banks, (sworn.)   I never heard Alfred Mays threaten James Campbell; I never said I heard him.

Philip Smith, (sworn.)   I was acquainted with Mays and Campbell; I lived in the neighborhood.   I know of the manner which Campbell had been treated by Mays.

Horace Brown, (sworn.)   I know Mr. Mays and Mr. Campbell.   I have known Mays to whip Campbell, several times. Mays was in the habit of domineering over Campbell.   I was intimate with him—Mays was a violent man, weighed between 160 and 175 pounds.

(By State.)   Mays struck me once; I think he struck me with his fist; I was intoxicated; I was asleep and was awaked by the blow.

(By Court.)   Never knew Mays to attack any one with a weapon likely to produce death.

(By Prisoner.)   I never heard it was believed that he would cut or shoot.

(By State.)   I am not prejudiced towards Mays.   I heard Mays say, " he intended to keep Campbell for his own whipping."   Campbell was fourteen or fifteen years old at the time. Mays was his brother-in-law.   I saw Mays whip Campbell once at Watkins'.   Mays was not the main support of the family. Mays whipped him at Watkins' with his fist.   It was two or three years before, when Mays said he intended to keep Campbell for his own whipping; he was sober.   I suppose Campbell is about 24 years old.

Campbell *vs.* The State of Georgia.

Elizabeth Green, (sworn.)   Mr. Campbell was at our house the Saturday night of the difficulty ; I did not see him.

John Guedron, (sworn.)   I passed the men the night of the difficulty, at the red hill above Battle-Row.   I heard Mays say, " he had whipped Campbell, could whip him, and would whip him."   I heard no more.

(By State.)   It was between 7 and 8 o'clock—it was about 20 yards from the bridge—it was dark.   I recognised Campbell and Mays by their voices.   Did not know Ratcliff.

Anthony D. Hill, (sworn.)   I never saw Mays to know him.

Nancy Campbell, (sworn.)   Mr. Ratcliff and his family were at my house between 7 and 8 o'clock, on Saturday night.   They stayed at my house about an hour.   They lived beyond my house about three miles.   They started for home ; it was dark ; they had a child—Mrs. Ratcliff carried the child.

(By State.)   Mrs. Read's gate is about two miles from my house, not certain about the distance.

Susan Mays, (sworn.)   I am the widow of Alfred Mays—I am the sister of James Campbell.   I was at home when Mr. Mays was brought home.   He would often say that he did not think he would live long, whenever he was sick ; would get up in bed of night and say he would die before morning.   He had the dyspepsia ; he was dissipated in his habits ; he was very quarrelsome.   He has always domineered over Campbell—was in the habit of whipping him.   During his last sickness, he never took farewell of me.   He said Monday, he thought he should be up ; he asked me if I thought he would be able to go to work in six months ; I replied, I hoped he would.   This was on Monday evening ; don't know the time.   He would not allow the children to stay in the house ; he was in the habit of swearing ; was talking sometimes about getting up ; was speaking about cutting logs for Mrs. Skinner, on Sunday night ; he said he did not know when he could cut logs, but would send Nev to cut them.   Have known him to whip Campbell three or four times. Never knew Campbell to raise a fuss with any body—Mays always started it.

VOL XI 46

(By State.)    Mays would quarrel with people, tipsey or not. He got drunk every day for 12 months before he died ; he would always quarrel with Campbell when he met him in company. Last Christmas, two years ago, I saw Mays whip Campbell at our house ; Mr. Evans was there—his nephew was there. Have not seen him whip Campbell since. Both were drinking. In this last sickness, Mays said he would die—I heard the rest say he said so—did not hear him myself. Mr. Campbell did not come to our house the night of the difficulty.

James Ratcliff, (sworn.)    On the night of the difficulty I was at home—I was not with Campbell—had not seen Mays that day at all.

(By State.)    I think I live between two and three miles from Mrs. Campbell's. I live off the road, she lives on. I was at home all night. During the day, I was in town at work.

(By Court.)    I left the stone-yard in town, little before sundown : went home in wagon, pretty near nine when I got home; went the road by Mrs. Fox's ; I went by Mrs. Read's, stopped at Mrs. Campbell's about one hour ; my wife was with me.

(By State.)    Did not see Mays or Campbell as I was going home.

William Glendening, (sworn.)    I was pretty well acquainted with Mays ; knew his general character for violence ; always understood he was very quarrelsome—he wished several times to quarrel with me.

*For the State.*

James Watkins, (sworn.)    I lived in Watkinsville. I saw Mays and Campbell as they passed up. Do not know that I saw Ratcliff; recognised Mrs. Ratcliff's voice. Mays was not in the road when Campbell came right up ahead the wagon 20 or 30 steps; it was after dark, between 7 and 9 o'clock. Mr. Ratcliff's wife said, " come on, James," and the wagon went on ; she spoke, I thought, to Campbell.

(By Prisoner.)    Between 7 and 9 o'clock, I think, when Campbell came up and asked what was the matter; Mays gave him a very short answer.

Campbell *vs.* The State of Georgia.

Samuel Read, (recalled.) I did not see James Campbell at Watkins', on the Saturday night; he was above Watkins', going up the road; Mays was behind. I think I heard Mrs. Ratcliff's voice before I saw Campbell. The wagon may have been 100 yards or more behind Campbell. Did not see Ratcliff. Mays and Campbell were disputing. Don't remember hearing any thing pass between them at Watkins'. It was between 7 and 8 o'clock.

(By Court.) Mays was cursing loud enough to have been heard to the wagon.

Joseph Skinner, (sworn.) I saw three men as I was going up Saturday night; two seemed to be very angry—one, by the voice and size, I took to be Mays—the other was about the size of Campbell; the other was at a distance. I heard Mays say, I can whip you and Ratcliff both.

(By Prisoner.) Campbell is a small man. The third spoke very low. It was about half-past 7 o'clock.

(By Court.) I live about a mile from where Mays lived; knew him four or five years. It was opposite the bridge, between the plank road and Battle-Row.

When the counsel for the State in this case, had proceeded to make out the *prima facie* case, as to the state of mind and body of decedent, on the several occasions when these declarations were made, which will be found in the record of the evidence, the Court was moved by the counsel to admit such declarations. The counsel for the prisoner then gave notice, that they desired to attack these declarations, by testimony to be offered by them. The Court, thinking that a *prima facie* case had been made out, which would authorize these declarations to go to the Jury, subject to be impeached or weakened by conflicting testimony, to be introduced by the prisoner, suggested that the whole question should be submitted to the Jury, to be determined by them, under the charge of the Court. In this, the counsel for both sides acquiesced, and the whole testimony in relation thereto, was thus submitted to the Jury, and they carefully charged by the Court as to the legal principles which should

control their determination, as to whether these declarations were uttered under the solemn sanctions necessary to make them testimony.

The Jury found the defendant guilty of voluntary manslaughter.

A motion for a new trial was made, on the ground that the verdict was contrary to law and evidence, and not sustained by evidence.

The Court refused to grant a new trial, and this decision is assigned as error.

JOHN K. JACKSON and ANDREW H. H. DAWSON, for plaintiff in error.

Attorney General SHEWMAKE, for defendant.

*By the Court.*—LUMPKIN, J. delivering the opinion.

James Campbell, convicted of manslaughter in the Superior Court of Richmond County, sues out a writ of error to reverse the judgment of the Court below, in refusing him a new trial. His application for a re-hearing, was based upon two grounds : 1st. Because the *dying declarations* of Alfred Mays, the person killed, were permitted to go in evidence to the Jury, contrary to the provision in the 6th amendment of the Constitution of the United States, entitling the accused to be confronted with the witnesses against him. And 2dly. Because these *declarations* were not admissible, for the reason, that they were not made under the consciousness of immediate death.

[1.] The first point submitted in the argument is, that death-bed declarations in cases of homicide, cannot be given in evidence, because their admission would contravene the 6th article of the amendments to the Constitution of the United States, entitling the accused in all criminal prosecutions, to be confronted with the witnesses against him.

The answer given to this objection is, that the article in ques-

tion, applies to the United States government only, and was not intended to control the laws of the several States.

That this amendment, like the other nine adopted at the same time, was primarily introduced for the purpose of preventing an abuse of power by the Federal Government, is readily conceded. Grasping, however, as the National Judiciary is supposed to be, and studious to accumulate power in the central government, it may well be questioned, whether the limitations and restrictions imposed by these amendments, were necessary. The rights which they were designed to protect, were too sacred to be violated by any republican tribunal, legislative or judicial. A disregard of them, was mainly instrumental in overturning the Stuart dynasty in England ; depriving one monarch of his head, and another of his crown. And no Court, probably, in this free country, would have ventured to enforce practices so arbitrary, unjust, and oppressive, as those inhibited by these amendments ; practices condemned by Magna Charta—the Petition of Right—the Bill of Rights—and more especially, by the Act of Settlement, in Britain.

The principles embodied in these amendments, for better securing the lives, liberties, and property of the people, were declared to be the " birthright " of our ancestors, several centuries previous to the establishment of our government. It is not likely, therefore, that any Court could be found in America of sufficient hardihood to deprive our citizens of these invaluable safeguards. Still, our patriotic forefathers, out of abundant caution, superadded these amendments to the Constitution, so as to place the matter beyond doubt or cavil, misconstruction or abuse.

And the question to be decided now is, not whether these amendments were intended to operate as a restriction upon the government of the United States, but whether it is competent for a State Legislature, by virtue of its inherent powers, to pass an Act directly impairing the great principles of protection to person and property, embraced in these amendments ?

That the power to pass any law infringing on these principles, is taken from the Federal Government, no one denies. But is it a part of the reserved rights of a State to do this ? May the

Legislature of a State, for example, unless restrained by its own Constitution, pass a law " respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech or of the press; or the right of the people peaceably to assemble and petition the government for a redress of grievances ? " If so, of what avail, I ask, is the negation of these powers to the General Government ? Our revolutionary sires wisely resolved that religion should be purely voluntary in this country; that it should subsist by its own omnipotence, or come to nothing. Hence, they solemnly determined that there should be no church established by law, and maintained by the secular power. Now, the doctrine is, that Congress may not exercise this power, but that each State Legislature may do so for itself. As if a National religion and State religion, a National press and State press, were quite separate and distinct from each other; and that the one might be subject to control, but the other not !

Such logic, I must confess, fails to commend itself to my judgment. For let it constantly be borne in mind, that notwithstanding we may have different governments, a nation within a nation, *imperium in imperio*, we have but *one* people; and that the same people which, divided into separate communities, constitute the respective State governments, comprise in the aggregate, the United States Government; and that it is in vain to shield them from a blow aimed by the Federal arm, if they are liable to be prostrated by one dealt with equal fatality by their own.

But I deem it unnecessary to pursue this line of argument and of illustration, any farther. When it can be demonstrated that an individual or a government has the *right* to do *wrong*, contrary to the old adage, that one person's *rights* cannot be another person's *wrongs*, then, and not before, will it be yielded that it is a part and parcel of the original jurisdiction of the State governments, reserved to them in the distribution of power under the Constitution, to enact laws, to deprive the citizen of the right to keep and bear arms; to quarter soldiers in time of peace, in any house, without the consent of the owner;

Campbell *vs.* The State of Georgia.

to subject the people to unreasonable search and seizure, in their persons, houses, papers and effects ; to hold a person to answer for a capital, or otherwise infamous crime, without presentment or indictment ; to be twice put in jeopardy of life or limb for the same offence ; to compel him, in a criminal case, to be a witness against himself; to deprive him of life, liberty or property, without due course of law ; to take private property for public use, without just compensation ; to deprive the accused in all criminal trials, of the right to a speedy and public trial, by an impartial Jury ; to be informed of the nature and cause of the accusation ; *to be confronted with the witnesses against him ;* to have compulsory process for obtaining witnesses in his favor, and to have the assistance of counsel for his defence ; to enact laws requiring excessive bail, imposing oppressive and ruinous fines, and inflicting cruel and unusual punishments !

From such *State rights,* good Lord deliver us ! I utterly repudiate them from the creed of my political faith !

It was not because it was supposed that legislation over the subjects here enumerated might be better and more safely entrusted to the State governments, that it was prohibited to Congress. It was to *declare* to the world the fixed and unalterable determination of our people, that these invaluable rights which had been established at so great a cost of blood and treasure, should never be disturbed by *any* government. They feared no interference from their own local Legislatures. They determined to fetter the hands of the Federal authority, the only quarter from which danger was apprehended.

One of the reasons set forth in the preamble to these amendments, for their adoption was, that it would " extend thereby, the ground of public confidence in the government,. and thus best secure the beneficent ends of its institution." *Marbury & Crawford's Digest,* 660. What confidence will be reposed in a *State* government, whose legislation should be characterized by acts which disgrace the most tyranical epoch of the British monarchy ? A free people would instantly and indignantly reject it and its authors.

The famous indictment preferred by the Grand Inquest of 1776, against George the Third, charged him, among other things, with " quartering large bodies of armed troops among the people; " and with depriving the provinces, in many cases, of " the benefits of trial by Jury; " two of the articles expressly forbidden by the amendments. It further alleged, that he had " *abolished the free system of English law in a neighboring province*, establishing therein an arbitrary government, and enlarging its boundaries so as to render it at once an example and fit instrument for introducing the same *absolute rule* into these colonies." To uphold this " free system of English law," was the great end and object of the whole of the ten amendments— but for the apparent irreverence, I would say *commandments*— which were added to the Constitution. If the foregoing acts justly branded this trans-Atlantic Prince as a tyrant, and rendered him unfit to be the ruler of a free people, republican legislators will beware how they tread in his footsteps.

While this Court yields to none in its devotion to State *rights*, and would be the first to *resist* all attempts at Federal usurpation, it feels itself called on by the blood of the many martyrs, who nobly died to maintain the great principles of civil liberty contained in these amendments—*our American Magna Charta*— to stand by, support and defend the rights which they guarantee, against all encroachments, whether proceeding from the National or State governments.

The Chancellor who delivered the opinion of the Court of Errors, in *Barker vs. The People*, (3 *Cow. R.* 686,) one of the cases cited in support of the position which I am combating, notices the fact, that in the Constitutions established by the different States, since the adoption of the amendments in question, provisions are inserted in reference to the same subjects embraced in the amendments. And the inference is, that the States which imposed the same restraints upon their own governments, which were contained in these amendments, gave conclusive evidence that they conceived that they were at liberty to do so or not; and that the Constitution of the Union imposed no restraint upon the State governments; and that to consider these

Campbell *vs.* The State of Georgia.

amendments as operative upon the several States, would be to render nugatory the like provisions in the Constitutions of many of the States.

There is plausibilty in this proposition. It is a curious circumstance, however, and one worthy of remark, that the States in framing their Constitutions, have done things more strange and unaccountable than this. Many of them have imposed restraints by their Constitutions, on certain powers, over which the States are expressly forbidden to legislate, by the Federal Constitution. By the latter, for instance, it is provided that no State shall pass any *ex post facto* law. The same prohibition is contained in the Constitution of Georgia, Massachusetts, Pennsylvania, Delaware, Maryland, North and South Carolina, Kentucky, and I believe, of every State in the Union. Did these States conceive that they had the power to pass an *ex post facto* law, or not? Let this example, one only of many which might be adduced, suffice to show how utterly unsatisfactory is the course of reasoning adopted by the Court of Errors of New York.

Other precedents are cited to sustain the proposition, that none of these amendments extend to the State governments, but were intended for Congress and the United States Courts. *James vs. The Commonwealth,* 12 *Serg. & Rawl.* 220. *The Mayor and City Council of Baltimore,* 7 *Peters,* 243. I will not stop to examine these cases, or to array the conflicting opinions of Courts and Jurists, equally eminent, on the other side.

The question, I am aware, is still regarded as an unsettled one; but in this country, the weight of authority will be found in favor of the doctrine, that governments are not clothed with absolute and despotic power; but that independently of written constitutions, there are restrictions upon the legislative power, growing out of the nature of the civil compact and the natural rights of man. And that, when certain boundaries are overleaped and a law passed subversive of the great principles of republican liberty and natural justice—as for instance, taking away without cause, and for no offence, the liberty of the citizen—that it would become the imperative duty of the Courts, to pronounce such a Statute inoperative and void.

In *Fletcher vs. Peck,* (6 *Cranch,* 87,) Chief Justice *Marshall* himself says, "It may well be doubted whether the nature of society and of government, does not prescribe *some limits* to legislative power."

In *Terrell vs. Taylor,* (9 *Cranch,* 43,) the Court say, "We know of no case in which a legislative act to transfer the property of A to B, without his consent, has ever been held a constitutional exercise of power in any State in the Union. On the contrary, it has been constantly resisted, *as inconsistent with first principles.*"

In *Green vs. Biddle,* (8 *Wheat.* 1,) Mr. Justice *Washington,* in delivering the opinion of the Court, speaks of " *the universal law of all free governments.*"

In *Wilkinson vs. Leland,* (2 *Peters,* 654,) the Supreme Court say, "that government can scarcely be deemed free, where the rights of property are left solely dependent upon the will of the legislative body, without any restraint. *The fundamental maxims of a free government seem to require, that the rights of personal liberty and private property, should be held sacred.*"

In *Bonaparte vs. The Camden & Amboy R. R. Co.* (1 *Baldwin's C. C. R.* 223,) it was adjudged, that the Legislature has not the power to take the property of a man, for private purposes, without his consent; that if a law was clearly open to that objection, it would be a fatal one.

Now, all of these adjudications, with numerous others, to the same effect, proceed upon the fundamental principles of natural justice, independent of any constitutional restriction.

In the case of *The Regents of the University of Maryland vs. Williams,* (9 *Gill. & Johnson,* 365,) the Court is still more explicit. After deciding that the Act of the Legislature of Maryland, which took away the vested rights of the Regents, was void, as being in collision with the Constitution of the United States; Chief Justice *Buchanan* adds, "but the objection to the validity of the Act of 1825, does not rest alone for support upon the Constitution of the United States."

" *Independent of that instrument, and of any express restriction in the Constitution of the State, there is a fundamental principle of*

Campbell *vs.* The State of Georgia.

*right and justice, inherent in the nature and spirit of the social com-pact (in this country at least,) the character and genius of our gov-ernments, the causes from which they sprang, and the purposes for which they were established, that rises above the restraints and sets bounds to the power of legislation, which the Legislature cannot pass, without exceeding its lawful authority. It is that principle which protects the life, liberty, and property of the citizen, from viola-tion, in the unjust exercise of legislative power."*

The Constitution of New York confers upon the Legislature of that State, the broad grant *to pass all laws* which they deem necessary and proper for the good of the State, and which shall not be repugnant to the paramount law. And yet, in *Taylor vs. Porter,* (4 *Hill's R.* 146,) Mr. Justice *Bronson* says, " under our form of government, the Legislature is not supreme. It is only one of the organs of that absolute sovereignty which resides in the whole body of the people." And notwithstanding the general grant of power to pass *all* constitutional laws, he denied that it reached to the unwarrantable extent of taking the pro-perty of A and giving it to B, with or without compensation. " Neither life, liberty, nor property," says the learned Judge, " except when forfeited for crime, or when the latter is taken for public use, falls within the scope of this power."

It is for this reason, that the power of the Legislature, independ-ent of any constitutional restrictions, to pass retrospective laws which shall have a *retroactive* effect, has been uniformly denied. 2 *Gallison,* 139; 1 *N. H. R.* 213; 16 *Mass. R.* 215; 7 *Johns. R.* 477.

But we do not intend to put our opinion in this case, upon this foundation, however solid it may be. For while we have denied the omnipotence of the Legislature, the tendency of our administration, nevertheless has been, to side with those who refused to declare an Act of the Legislature void, because it conflicts with the Court's views of reason, expediency or justice ; and who recommend an appeal to the ballot-box as the only remedy for *unwise* legislation. And one of the strongest argu-ments against Judicial interposition in such cases is, that apart from a *written Constitution,* our ideas of natural justice are vague and uncertain, regulated by no fixed standard ; the ablest

and best men   differing  widely upon  this, as well  as all other subjects.

. But as to questions arising under  these  amendments,  there is nothing  indefinite.   The  people  of the  several  States, by adopting these amendments, have  defined  accurately  and  recorded permanently their  opinion,  as to  the  great  principles which they embrace ;  and to make  them  more  emphatic  and enduring, have had them incorporated into  the  Constitution of the Union—the permanent law of the  land.   Admit,  therefore, that the Legislature of a State  may  be  absolute  and  without control over all  other  subjects,  where  its  authority  is not restrained  by  the  'Constitution  of the ` State  or  of  the  United States ; still, viewing these amendments as we do, as  intended to establish justice—to secure the blessings  of liberty—to protect person and property from  violence ;  and  that  these  were the very purposes for which  this government was  established, we hold that they constitute a limit to  all  legislative  power, Federal or State, beyond which  it  cannot  go ;  that these vital truths lie at the foundation of our free,  republican  institutions ; that without this security for personal liberty and  private  property, our social  compact  could  not  exist.   No  Court  should ever presume that it was  the  design of the  people  to  entrust their representatives  with the  power to take  away  or  impair these securities.   Such an assumption would be against all reason.   The very genius,  nature  and  spirit of our  institutions amount to a prohibition  of such  acts  of legislation,  and  will overrule and forbid them.

I admit, that all criminal jurisdiction rightfully  belonging to any independent community, is  vested  in  our  State  governments, except  where,  to promote the general welfare, it has been expressly  delegated  to  the  national government.   To  paraphrase the language of a distinguished Justiciary,  the  Legislature may enjoin, permit, forbid and punish ;  they  may  declare new crimes ; they may, in a word, *command* what is  right, and *prohibit* what is  wrong, in the broadest sense ;  but  they  cannot commit  political suicide, or rather *parricide,* by violating  or  destroying the great first principles  of American  civil  liberty,  as

set forth and declared in the ten amendments of the Constitution—a legal decalogue for every civilized society, in all time to come.

No such attempt would be considered a rightful exercise of legislative authority. To maintain that our Federal or State Legislature possess such a power, is, in our opinion, a political heresy, altogether inadmissible. The British Parliament dare not, at this day, with all its transcendental power, commit such an outrage. For such monstrosity in legislation we must go to semi-imperial France, or semi-barbarous Russia. Any attempt in this country, at this day, to establish religion ; to curtail the freedom of speech or of the press ; to deprive a party of the privilege of appearing personally, or by counsel ; to inflict cruel or unusual punishments ; to immure a prisoner without trial, in a dungeon for life ; to subject a citizen to a star-chamber proceeding instead of a public trial ; would shock not only the common sense, but sense of justice of the teeming millions in this free and happy country! Shame! shame! upon such legislation, would be indignantly uttered by ten thousand tongues!

No republican Legislature, I am persuaded, will ever be so forgetful or regardless of moral rectitude as to incur so severe a rebuke. Our law-makers are too deeply penetrated with a sense of duty and of justice; too profoundly imbued with moral and religious principle ; too much interested in the enjoyment of that security to person and property, (the fruit of our free institutions) which these amendments provide ; too indelibly impressed with the worth of these principles, by a consideration of their cost, deliberately to trample them under foot. Should the Legislature, through haste or inadvertence, pass an act at war with the spirit, object and design of our social system, as manifested in this charter, it would become the imperative duty of the Courts, however delicate the task, to vindicate the rights of the citizen, by pronouncing such a Statute invalid. This Court has been compelled more than once since its organization, reluctantly to perform this painful function.

[2.] Holding then, as we do, that the inviolability of the rule must be preserved, which, in all criminal prosecutions entitles the

accused to be confronted with the witnesses against him, does it abrogate the Common Law principle, that the declarations *in extremis* of a murdered person, as to the homicide, are admissible in evidence? The right of a party accused of a crime, to meet the witnesses against him, face to face, is no new principle. It is coeval with the Common Law. Its recognition in the Constitution was intended for the two-fold purposes of giving it prominence and permanence. The argument for the exclusion of the testimony, proceeds upon the idea that the deceased is the witness, when in fact it is the individual who swears to the statements of the deceased, who is the witness. And it is as to *him* that the privileges of an oral and cross examination are secured.

The admission of dying declarations in evidence, was never supposed, in England, to violate the well-established principles of the Common Law, that the witnesses against the accused should be examined in his presence. The two rules have co-existed there certainly, since the trial of Ely, in 1720, and are considered of equal authority.

The constant and uniform practice of all the Courts of this country, before and since the revolution, and since the adoption of the Federal Constitution, and of the respective State Constitutions, containing a similar provision, has been to receive in evidence, *in cases of homicide*, declarations properly made, *in articulo mortis.*

It constitutes one of the exceptions to the rule which rejects *hearsay evidence.* It is founded in the necessity of the case; and for the reason, that the sanction under which these declarations are made, in view of impending death and judgment, when the last hope of life is extinct, and when the retributions of eternity are at hand, is of equal solemnity as that of statements made on oath. With the policy of the rule which has been so ingeniously assailed by counsel for the accused, we have nothing to do. I will not deny but that it may be justified by that urgent necessity, which is a sufficient ground for dispensing with any rule. Chief Justice *Tilghman* thought there could not be a stronger case of necessity, than that which re-

quires the declarations of the dying victim of secret assassination to be received, in order to the detection and punishment of his murderer. Moreover, he supposed that its allowance, and the knowledge that upon it, the culprit might be condemned, would have a saving and protecting influence upon society. Still it must be admitted that great caution should be observed in the use of this kind of evidence ; and that were the point, *it -res integra,* much might be said against the practice.

Without dwelling longer upon this exception, we consider it settled, that *in case of homicide,* declarations by one mortally wounded and who is conscious of his condition, are admissible in evidence, both as to who was the perpetrator of the injury and the facts which attended the transaction.

[3.] The only remaining ground of objection is, that the evidence does not sufficiently show that the deceased knew or thought that his end was *near ;* and that the declarations testified to were made with the belief of death present to the mind of the declarant. That declarations, to be admissible in evidence, must be made under apprehension of immediate death, is unquestionable. The facts disclosed by the record satisfied the mind of the presiding Judge, as they do ours, that the statements were made at a time when the deceased was without hope of life, and in expectation of approaching dissolution.

The wounds were inflicted on Saturday night, the 19th of January, 1851 ; one of which was so severe as to cause a protrusion of the membranes of the intestines from the abdomen ; and in this state the deceased lay, so exposed to the bitter cold of winter, until next morning. When found, he was completely torpid, and he continued in this condition until he died— before sun-rise Tuesday morning—no re-action having taken place in his system.

John Evans testifies that he was with him a great deal during his illness, spending three hours or more at one time, on Sabbath evening. He heard him say he was very bad off; he was cut all to pieces, and he believed he should die. John J. Flournoy swears, that on Monday afternoon, about 4 o'clock, he saw Mays. · He found him very weak, and very much depressed

Campbell *vs.* The State of Georgia.

in feeling. He stated that certain persons (naming them) who had inflicted the wounds, had threatened to kill him; and that they had done it—or nearly done it. William Goodwin called on the deceased, on Sunday and Monday evenings, and staid some hours with him. He was in great pain, and said he would never get over it; that he was cut all to pieces; and that he wanted Mr. Evans to attend to having these people arrested, if he died. Seaborn Skinner, a neighbor of the deceased, and known to him as a member and a class-leader of the Church, called on him on Monday. He told witness he thought he would die; and when he bid him good bye, Mays said to witness, he never expected to see him in this world again, and asked him to pray for him.

This testimony, embracing as it does, separate conversations held with different persons, at various times, at their respective interviews with the deceased, would seem to be conclusive as to the belief of the party, that he was a dying man; and that, consequently what he said to the witnesses on these occasions was properly submitted to the Jury by the Court, and with equal propriety, regarded by them as the *dying declarations* of Alfred Mays, in the full view of death and eternity as just at hand.

[4.] Is it the province of the Judge or of the Jury to decide whether the deceased thought himself dying or not, when he made the declarations inculpating the defendant?

His Honor Judge *Starnes,* after giving to this case, as he does all others which come before him, the most careful and scrupulous attention, and bringing to bear upon it that clear and discriminating judgment, patient and thorough research, which characterises all of his decisions, *held,* that the proper course to be pursued was this: that a *prima facie* case of the moral consciousness required, should be exhibited to the Court in the first instance, as preliminary to the admission of the testimony. This done, the evidence should be received and left for the Jury to determine whether the deceased was really under the apprehension of death when the declarations were made, which they might infer either from circumstances or the expressions used.

All the analogies of the law, as to proof of books, hand-

writing, &c., would seem to sanction this practice; and it is certainly in accordance with the symmetry of our Judicial system. Up to the time of Woodstock's case, decided in England in 1789, the whole subject seems to have been left to the Jury, under the direction of the Court, as a mixed question of law and fact. Since that period, it has been held there, to be the peculiar and exclusive duty of the Court, to decide whether the decedent made the declarations under the consciousness of inevitable death.

[5.] Affirming then, as we do, the doctrine of the Circuit Judge, that the condition of the deceased is to be determined by the Jury, by his statements, and by the character and nature of the injury, his appearance, conduct, &c. why should this *issue of fact* be placed upon a different footing from any other? And if there be evidence to warrant the verdict, why should it be disturbed by this or any other Court?

For myself, I must say, that the testimony satisfies me, that Alfred Mays *felt* that his departure was at hand; that he was going the way of all flesh; that he was fully sensible of the hopelessness of his condition.

On the whole, therefore, our conclusions are clearly against the prisoner, on all the grounds on which he seeks a reversal.

Judgment affirmed.