MITCHELL vs. THE STATE OF GEORGIA.

[Blandford, Justice, being disqualified, did not preside in this case.]

1. This court will not interfere with the verdict of a jury where there is evidence to sustain it, and the judge who tried the case is satisfied with it, unless there has been some misapprehension of their duty made manifest, or it appears that some right has been denied the defendant, or unless improper bias or prejudice on their part is evident. But the strength of the present case is much weakened by the character of the evidence, and it appears that this trial has not developed the whole truth.

2. Dying declarations constitute one of the exceptions to the rule which rejects hearsay evidence. Their admission is founded on the necessity of the case and the reason that, being made in view of impending death and judgment, when the hope of life is extinct and the retributions of eternity are at hand, they stand upon the same plane of solemnity as statements made under oath. They are admissible only when made by a person in the article of death who is conscious of his condition, and then only in cases of prosecutions for homicide, and for the sole purpose of showing the cause of death and the person who committed the act; and great caution is necessary, not only in the admission, but in the use of this kind of testimony.

(a.) The case at bar falls short of the requirements necessary to make dying declarations available.

(b.) The court must judge of the preliminary evidence in the first instance. If he deems it *prima facie* sufficient, he should admit the declarations, instructing the jury afterwards to pass finally for themselves on the question, whether or not the declarations were conscious utterances in the apprehension and immediate prospect of death.

3. That prior to a homicide two messages were brought by little boys to the deceased, purporting to come from the defendant, to the effect that the deceased should come to the place of defendant, that "they were ready for him," was inadmissible, the messengers not being introduced and no effort being made to find them.

(a.) Statements and conversations between others, in defendant's absence, distinct from any conversations shown by the defence, and of which the defendant was not notified, were inadmissible; statements concocted in advance as part of a projected scheme of crime cannot be introduced by the party making them, in his own behalf, though they may be proved by the opposite party to show premeditation and preparation.

(b.) Where a witness reached the scene of a conflict in a very few minutes after the deceased fell, and assisted in bearing him away,

Mitchell *vs.* The State.

and when they had gone about thirty or forty steps the wounded man asked the witness, "What did you shoot me for?"—the whole transaction not occupying more than five minutes—such facts were a part of the *res gestæ.*

(*c.*) The practice prescribing the order in which testimony shall be introduce d is for the convenience of the court, and may be modified as he deems proper for the advancement of the ends of justice.

4. To lay the foundation for admitting the testimony of a deceased witness, it must have been given on a former trial upon substantially the same issues, and between substantially the same parties; then any one who heard it and who professes to remember the substance of the entire testimony as to the particular matter about which he was called to testify, is a competent witness for this purpose.

(*a.*) A substantial and not a literal compliance with these conditions is all that is required. Where a witness testified that he remembered "the substance of the material part of her (the deceased witness's) testimony affecting the case, but couldn't say that he remembered the entire substance of all she said," he was a competent witness, and his testimony was admissible.

(*b.*) At most, the competency of the witness was only doubtful, and in such cases the well established practice is to admit the evidence, and allow the jury to pass upon the circumstances affecting its competency in determining its credibility and weight.

5. Where the deceased and other members of his family had acted in concert in a series of aggressions extending through several days, and acts and threats on their part had been communicated to the prisoner and done in his presence, other like acts and threats on the part of one of the persons so acting with the deceased were admissible to explain the prisoner's conduct and account for the motive with which he ultimately acted, although these special acts and declarations were not communicated to the prisoner and were not in the presence of the deceased.

6. A party has a right to make a thorough and sifting cross examination of the witnesses called against him. Wherever the purpose is to impeach or discredit the witness, great latitude should be allowed by the court in cross examinations. Such appears to have been the purpose here, but to have avowed it would have defeated the object in view.

7. The court should have charged the jury as requested, that "if they had a reasonable doubt as to whether Ben Mitchell (the defendant) acted, when he shot, under circumstances calculated to excite the fears of a reasonable man, or whether he felt at the time he shot, and had reason to feel from the circumstances, that it was necessary to shoot to save his own life, limb or person, then he was justifiable."

October 23, 1883.

Criminal Law. Evidence. Witness. Dying Declara-
tions. Murder. Homicide. *Res Gestæ.* Practice in Su-
preme Court. Before Judge WILLIS. Muscogee Superior
Court. May Term, 1883.

Ben Mitchell and Holland Mitchell (his brother) were
jointly indicted for the murder of Jesse B. Wright. Ben
Mitchell was tried separately. It was not denied that
the defendant killed Wright with a pistol; but he insisted
that he did so in self-defence, or, at least, that he acted
under reasonable fears. It is unnecessary to detail this
voluminous and conflicting evidence.. To the report con-
tained in the decision it is only necessary to add the follow-
ing: A difficulty had been imminent for several days be-
fore the homicide, growing out of the whipping of Wright's
little boy by Mitchell's son, under the direction of the de-
fendant (he asserting that young Wright and others were
in his watermelon patch, and he directed his son to thrash
them out of it). The two Wrights, Jesse and Lovick,
who were brothers, seemed to resent deeply the affront
which they considered had been put upon them. Each
side insisted that the other brought on the final catastrophe.
It occurred on the sidewalk near the house of Holland
Mitchell; defendant also lived not far away. Both Hol-
land Mitchell and Lovick Wright were near by when the
homicide occurred. On the morning of the killing, de-
fendant went to a magistrate's office, in the city of Colum-
bus, and asked for a peace warrant against the Wrights.
At the time he had a shot-gun, and on the same day a
pistol. The magistrate advised a settlement of the matter.
Holland Mitchell and a son of his came in and said the
former had seen Lovick Wright, and the matter was all
settled. Defendant then proposed to leave his gun at the
magistrate's office, but as the latter declined to be respon-
sible for it, defendant gave it to the son of Holland Mitchell.
This was between nine and ten o'clock in the morning;
the homicide occurred between twelve and one o'clock.

The other testimony is sufficiently set out in the decision for an understanding of the points ruled. Many witnesses were introduced, but most of them either did not see the difficulty at all, or only testified to collateral facts, or were some distance away from the scene of the homicide; and the accounts of the transaction were somewhat fragmentary. Dying declarations were relied on, as stated in the decision. Defendant stated and insisted that Wright fired the first shot, and that he himself shot in self-defence. He was wounded in the hand.

The jury found the defendant guilty, and recommended that he be imprisoned for life. He moved for a new trial on the following grounds :

(1) to (3.) Because the verdict was contrary to law and evidence and against the weight of evidence.

(4.) Because the court refused to admit in evidence what the prisoner said to the sheriff, a witness, at 12:45 P. M., as recited in his testimony. [The sheriff testified that about 12:45 P. M.—after the homicide—defendant came and surrendered himself and gave up his pistol. He was then asked what defendant said, but this was ruled out.]

(5), (6.) Because the court erred in admitting the declarations made by deceased, as testified to by witness F. M. Johnston, as dying declarations,—the objection being because deceased was not conscious of his condition when they were made, and because they were not made as to the cause of his death, nor as to the person who killed him.

(7.) Because the court erred in admitting said declarations, in view of the whole testimony touching the same in this case, under section 3781 of the new Code.

(8.) Because the court erred in admitting the testimony of witness for the state, Van Cook, as to two messages sent to the house of the mother of deceased on Sunday morning before the homicide,—because hearsay, and because it would allow parties to manufacture testimony. [The homicide occurred on Monday. The witness testified that on the preceding Sunday two messages came to the

house of the mother of Jesse Wright, where the witness, the deceased and his brothers and some others were. The bearers of these messages were little boys, unknown to the witness. They purported to come from Ben Mitchell. The first message was "to come up there; they were ready for him." The second messenger said that "there was a lot of negro men up to Mr. Ben Mitchell's waiting for Mr. Wright."]

(9.) (Immaterial to the decision.)

(10.) Because the court erred in its ruling on the question propounded to a witness for the state, Reynolds, viz: "Well, if you did so testify, it is the truth?"—The court said, "I don't think it is proper to ask a witness whether he did swear to the truth. The law is whether he swore to what he believed to be true. I don't think it is a proper question, put in that way."—This was objected to on the ground that it restricts the right of cross examination.

[Counsel for defendant asked the witness if he had not testified before the coroner's jury, on the inquest held over Wright, that the latter fell at the third fire. He replied that he did not think he had so testified. Counsel asked him, "Well, if you did so testify, it is the truth?" The court then ruled as just stated.]

(11.) Because the court erred in refusing to admit the evidence of Rosa Jones, who swore (on a former trial) on an issue substantially the same and between the same parties as the one at bar, and who was proved to be deceased. Counsel for defendant introduced John Peabody, Esq., and proposed to prove by him that said witness then swore, in substance, as follows: "She lived in adjoining lot to Holland Mitchell; that day betwixt eleven and twelve o'clock, Mr. Jesse Wright came up to Holland's and met Ben Mitchell in front of the gate. Mr. Wright said, 'Is that Holland?' Ben said, 'No, this is Ben. Holland is round the corner with your brother.' Mr. Wright drew his pistol out of his bosom and shot at Ben

twice, when Ben shot at him ; Mr. Lovick Wright and Holland came round the corner; they separated, Holland going across to Madison Stafford's, and Mr. Lovick Wright came on to his brother."—This was rejected on the ground that the witness, Peabody, had not laid the foundations for such testimony.

[The examination of the witness, John Peabody, Esq., preliminary to proving the former testimony of the deceased witness, is fully set out in the fourth division of the decision.]

(12.) Because the court excluded the testimony of a witness for defendant, Joe Evans, viz.: It was about 150 yards from where the homicide occurred; he didn't know the distance exactly; it was about a quarter before 12 o'clock A. M. on the day of the homicide that he saw Lovick Wright come to his house. He came up and asked where Ben Mitchell was.

[This testimony was insisted on upon the ground that his brother, Lovick, and deceased had been proved to have been acting in concert. These acts and sayings were offered to show motives of deceased ; also the reasonableness of the fear of the defendant at the time of the killing.]

(13.) Because the court erred in his rulings touching the testimony of Maria Sturkey, a witness for defendant, as to the sayings and acts of Lovick Wright the morning before the homicide.—This was insisted on upon the ground that such testimony tended to show the motive of deceased and the reasonableness of the fear of defendant, it being urged that the Wrights had been proved to be acting in concert. [This witness testified that defendant's son had whipped the son of Jesse Wright, having caught him in his father's patch; that on the Saturday night before the homicide, Jesse Wright and two or three others came to her house and asked where Ben Mitchell lived ; that she directed them to the house of defendant; that shortly afterwards she heard a considerable noise. and going to defendant's house, which was nearby, found Jesse Wright

whipping defendant's son with a cowhide; that his brother, Lovick, was with him, and two or three others were there; and that defendant was not then at home. Counsel for defendant then offered to show by her, that Lovick Wright came back on Monday morning, called for defendant, did not find him in, went around the yard with a pistol, and beat on the windows and doors. This was rejected by the court.]

(14.) Because the court erred in ruling out the testimony of said witness, Maria Sturkey, touching the acts and sayings of Lovick Wright, brother of deceased, at the house of the prisoner during the morning of the day of the homicide, and refusing to allow the witness to testify as to all the acts of violence that he did at prisoner's house at that time, or threats made against the prisoner at the same time. —This testimony was insisted on, on the grounds that such acts and sayings tended to show motives of deceased; a concert of action between deceased and his brother; and the reasonableness of the fear under which the defendant acted at the time of the killing. [See explanation under ground just preceding.]

(15.) Because the court erred in admitting the testimony of witness, J. D. Edwards, and especially the following:

Q. "Did you have a conversation with Mr. Wright just after the shooting, or, did he say anything?"

A. "Which one?"

Q. "Mr. Jesse Wright."

A. "No, sir, only he said——"

Defendant's counsel objected to deceased's sayings.

The Court—"You offer it as part of the *res gestæ?*"

Solicitor General—"Yes, sir."

Court—"Well, show how long it was."

Solicitor General—"Well, how long was it after the shooting?"

A. "Before I got to him?"

Solicitor General—"Yes, sir."

A. "It was five minutes, because I broke and run——"

Counsel for Defendant—"We have another objection—it is not in rebuttal of anything—*res gestæ* ought to be given in, in chief."

The Court—"Anything that was said, within a length of time that

would authorize it to be put in as *res gestæ* could be proved, and I think that the time that the witness says that he heard this statement of Mr. Wright would bring it in under the head of the *res gestæ*. I will let the testimony go to the jury."

Solicitor General—"You say you went to pick him up and help to carry him?"

A.—"Yes, sir."

Solicitor General—"Did he say anything to you then?"

A.—"He didn't that time, but after we had gone some thirty or forty steps he asked me, 'What did you shoot me for——"

Defendant's Counsel—"We object."

Court—"Let the testimony go on."

Defendant's Counsel—"We object to it, on the ground that the declaration is not admissible, under section 3773 of the Code, as *res gestæ*."

(16.) Because the court erred in admitting the testimony of a witness for the state, Robinson, to the effect that about eleven or eleven and a half o'clock on the morning of the homicide he met Jesse and Lovick Wright; that the latter turned off; that Jesse told the witness that " Pierce " (apparently another name of Lovick) was mad with him (Jesse), that the witness and he would go up and see Holland Mitchell, and would " cut off " Lovick, that he wanted the witness to " cut him off " and tell him that Holland Mitchell had been to the office and seen him (Jesse), and that it was all settled; that Jesse said he knew Ben Mitchell, that he was out of town and would not come within 400 yards of him (Jesse). The witness further stated that Jesse said they would go up the street and see Holland Mitchell; that they went to one or two places in town looking for him, but failed to find him; and that Jesse then went on in the direction of Holland Mitchell's house, following his brother, Lovick, apparently to keep him out of a difficulty, while the witness turned back. [The sayings of deceased to this witness were objected to.]

(17.) Because the court erred in overruling objection made by defendant's counsel to the admission of the conversation between deceased and Holland Mitchell at the " Enquirer Sun " office the morning before the killing, testified

to by the witness for the state, Van Cook.—Objected to on the grounds that it was talk between third parties and hearsay. [The substance of this conversation, as testified to, was that Holland Mitchell wanted to have the difficulty settled; that Jesse Wright said he did not care to have anything more to do with it; that Mitchell insisted that Jesse should come up to the house of defendant and settle the whole matter; that Mitchell wanted Jesse to come up and keep Lovick quiet.]

(18), (19.) Because the verdict was contrary to the charges of the court.

(20.) Because the court erred in the following charge : " If you believe that the deceased was conscious of the fact that he had been wounded and that he would die from the wound, and while in that condition he made a declaration or statement as to who wounded him, then you may consider that statement as though it had been given in under oath on the trial of the case. But, if you do not believe from the testimony that he knew or his mind was impressed with a full sense of his condition, then you should not consider his statement, if you believe he made a statement prior to his death."

(21.) Because the court refused to charge the following request : " If the jury believe that the deceased expressed an opinion at one stage of his illness, that he could not recover, and afterwards expressed an opinion that he would ' pull through,' meaning thereby that he had hopes of recovery, that then the statement previously made should not be considered as dying declarations."

(22.) Because the court refused to charge the following request : " If the jury have a reasonable doubt as to whether Ben Mitchell acted, when he shot, under circumstances calculated to excite the fears of a reasonable man, or whether he felt at the time he shot, and had a reason to feel from the circumstances, that it was necessary to shoot to save his life, limb or person, then he is justifiable."—This request was refused by the court, on the

ground that it was substantially given in his general charge.

The motion was overruled, and defendant excepted.

SMITH & RUSSELL, for plaintiff in error.

C. ANDERSON, attorney general, by JACKSON & KING; T. W. GRIMES, solicitor general, by J. M. McNEILL; B. A. THORNTON, for the state.

HALL, Justice.

1. Mitchell was indicted, tried and found guilty of murder, with a recommendation to mercy, and having been sentenced to imprisonment in the penitentiary for life, made a motion for a new trial upon various grounds, which being overruled, he prosecutes this writ of error to have that judgment reviewed by this court. This motion contains, among others, the usual ground that the verdict is contrary to law and evidence, decidedly and strongly against the weight of evidence, and, in fact, without evidence to support it. As the case necessarily goes back for another hearing, on account of errors in the decisions and rulings of the court below, this court, under ordinary circumstances, would abstain from any thing more than a passing allusion to the evidence; but, from the extraordinary and exceptional character of the circumstances attending the trial, we feel that we should fall short of our duty to the public and the defendant were we to omit calling attention to some of the prominent facts which the testimony develops.

It is some what remarkable that, of all the witnesses adduced by the state to prove the homicide, not one of the numerous persons immediately at or near the scene of the rencontre was placed upon the stand for that purpose, and that instead persons who were some distance off, whose view of the place was somewhat obstructed, whose attention was first called to the transaction by the discharge

of firearms, and who saw and could tell nothing as to the commencement of the difficulty, were the witnesses relied on. They could testify only as to circumstances from which inferences of an inconclusive nature were drawn. This matter had been brewing for several days; the attention of numerous persons had been drawn to its serious character; and yet no effective effort was made to prevent the meeting of the parties. Indeed, when the defendant applied to a magistrate on the morning of the day of the fatal rencontre for protection, that magistrate, instead of granting the peace warrant asked for, and securing the public tranquility by prompt and efficient action, put him off with a promise to see the other party and have the matter adjusted. He did see the other party, and all the assurance that he could obtain from them was that the difficulty might be considered "settled for the present" Perhaps this officer thought he was acting for the best; but as the result shows, his mistake was most lamentable. In all such cases, when the information reaches a peace officer, he should resort at once to his authority, and not assume the role of a negotiator; he is invested with power to command and restrain, and should not persuade and advise merely; he should not desist from the performance of his duty, as in this instance, by negotiating for an armistice, when he is bound by every obligation and is fully armed with power to secure peace. These circumstances, with others to be mentioned, impress us with the opinion that this defendant has not had a fair trial. The state did not avail itself of the evidence at hand to throw light upon some very questionable points. Five witnesses were introduced for the defendant who saw the beginning and the end of this bloody business; they were all near the spot, and all swore that the defendant did not attempt to shoot until he had been twice fired upon by the deceased and had been wounded in the hand. That he received this wound in that encounter was not denied. It also appeared that when the deceased was reached, after falling from the shot he had

received, his pistol, a revolver, was found between his legs; this was taken possession of by his brother; the pistol was not produced on the trial and no account was given of its condition when first found, and no attempt was made to account for this omission. If the account given by the defendant's witnesses was incorrect, the condition of this weapon when first picked up would surely have afforded some evidence that would have gone to contradict it,—evidence much more conclusive than that relied on. Whether this omission was designed or accidental, we do not know; but in either event, it would seem to justify the inference that the proof was withheld because it would have seriously damaged the prosecution. The importance of this evidence was not overlooked. A ball was extracted from a china tree standing at the spot where the shooting was done; it was compared with one drawn from the pistol deceased had at the time, and a trifling difference of two grains in the weight of the two was relied on to show that it came out of defendant's, and not out of deceased's, pistol. No effort was made to compare it with the balls left in defendant's pistol, and no allowance was made for any decrease in its weight by the friction it underwent by being shot into and extracted from the wood. "The presumption" says Mr. Starkie, (Evidence, 846) "that a man will do that which tends to his obvious advantage, if he possesses the means, supplies a most important test for judging of the comparative weight of evidence. It is to be weighed according to the proof which it was in the power of one party to have produced, and in the power of the other to have contradicted. If, on the supposition that a charge or claim is unfounded, the party against whom it is made has evidence within his reach by which he may repel that which is offered to his prejudice, his omission to do so supplies a strong presumption that the charge or claim is well founded; it would be contrary to every principle of reason and to all experience of human conduct to form any other conclusion. This consideration in criminal cases frequently

gives a conclusive character to circumstances which would otherwise be of an imperfect and inconclusive nature. * * * The same principle applies where a party having more certain and satisfactory evidence in his power relies upon that which is of a weaker and inferior nature. So pregnant with suspicion is conduct of this nature, that the law, as has been seen, has laid down an express and peremptory rule upon the subject, which, in cases within the scope of its operation, actually excludes the inferior evidence. It is for the jury, in their discretion, to apply the principle, in cases which do not fall within the prescribed limits of the rule." Haldane *vs.* Harvey, 4 Burr., 2484.

Another fact that is evident, is that this defendant never sought any meeting with the deceased and his party; he left his home and concealed himself to avoid them, while they were in constant pursuit of him, threatening his life. True, when tired out with skulking to avoid danger, he passed through the streets with a gun and pistol openly displayed to the magistrate's office. This was done, as he alleges, to protect himself from threatened violence and impending death; he first went to the nearest magistrate and finding him absent, applied to the other, who refused the warrant which he sought. Surely he was not then in pursuit of his enemies. He tried to leave his arms at this magistrate's office, and did temporarily deposit his gun there, which was carried away, as was shown, by another person. These facts are mentioned rather to show that this trial has not developed the whole truth, than for the purpose of interfering with any prerogative of the jury. We will never interfere with their verdict where there is evidence to sustain it, and the judge who tried the case is satisfied with it, unless there has been some misapprehension of their duty made manifest to us, or it appears that some right has been denied the defendant, or unless improper bias or prejudice upon their part is evident. With these general observations, we turn to the assignment of specific errors

claimed by the defendant's counsel to have been committed on this trial.

2. The first of these exceptions demanding our examination and careful consideration are those which relate to dying declarations. In Campbell's case, 11 *Ga.*, 374, 375, it is said that this species of testimony constitutes one of the exceptions to the rule which rejects hearsay evidence; it is founded on the necessity of the case, and for the reason that the sanction under which these declarations are made, in view of impending death and judgment, when the last hope of life is extinct, and when the retributions of eternity are at hand, is of equal solemnity as that of statements made under oath. " Still," it is added, " it must be admitted that great caution should be observed in the use of this kind of evidence." By the Code, §3781, dying declarations are admissible only when made by a person in the article of death, and who is conscious of his condition, and then only in the case of prosecutions for homicide, and for the sole purpose of showing the cause of death and the person who committed the act. The necessity for this great caution, not only in the admission, but in the use, of this kind of testimony, is enforced by judges and writers who have dealt with the subject. Among others Roscoe (Crim. Ev., 36), who says, " With respect to the effect of dying declarations, it is to be observed that, although there may have been an utter abandonment of all hope of recovery, it will often happen that the particulars of the violence to which the deceased has spoken are likely to have occurred under circumstances of confusion and surprise calculated to prevent their being accurately observed. The consequences, also, of the violence may occasion an injury to the mind, and an indistinctness of memory as to the particular transaction. The deceased may have stated his inferences from facts concerning which he may have drawn a wrong conclusion, or he may have omitted important particulars, from not having his attention called to them. Such evidence, therefore, is

liable to be very incomplete. He may naturally, also, be disposed to give a partial account of the occurrence, although possibly not influenced by animosity or ill will. But it cannot be concealed, that animosity and resentment are not unlikely to be felt in such a situation. The passion of anger, once excited, may not have been entirely extinguished, even when all hope of life is lost. See R. *vs.* Crockett, 4 C. & P. 544; 19 E. C. L. R., *ante*, p. 33, where the declaration was ' that damned man has poisoned me,' which may be presumed to be vindictive; and R. *vs.* Bonner, 6 C. & P., 386 (25 E. C. L. R.), where the dying declaration was distinctly proved to be incorrect. Such considerations show the necessity of caution in receiving impressions from accounts given by persons in a dying state, especially when it is considered that they cannot be subjected to the power of cross-examination; a power quite as necessary for securing the truth as the religious obligation of an oath can be. The security also, which courts of justice have in ordinary cases for enforcing truth, by the terror of punishment and the penalties of perjury, cannot exist in this case. The remark before made on verbal statements which have been heard and reported by witnesses, applies equally to dying declarations; namely, that they are liable to be misunderstood and misreported, from inattention, from misunderstanding, or from infirmity of memory. In one of the latest cases upon the subject, this species of proof is spoken of as an anomaly, and contrary to all the general rules of evidence, yet as having, where it is received, the greatest weight with juries. Per Coleridge, J., R. *vs.* Spilsbury, 7 C. & P. 196 (32 E. C. L. R.); 1 Phill. Ev., 251, 10. ed. ' When a party comes to the conviction that he is about to die, he is in the same practical state as if called on in a court of justice under the sanction of an oath, and his declarations as to the cause of his death are considered equal to an oath, but they are, nevertheless, open to observation. For though the sanction is the same, the opportunity for investigating the truth is very differ-

ent, and therefore the accused is entitled to every allowance and benefit that he may have lost by the absence of the opportunity of more full investigation by means of cross-examination.' Per Alderson, B. R., *vs.* Ashton, 2 Lewin C. C. 147."

This extract, which furnishes a brief but accurate and comprehensive summary of the law, shows, even in cases where all the preliminary requirements are fully met, as clearly as anything can, not only the unreliable and unsatisfactory character of such proof, but its dangerous effect, from the fact of the undue importance that juries are almost sure to give it, and should impress us with caution not only in its introduction, but in its application and use when admitted. On this subject the observations of Coleridge, Judge, in R. *vs.* Spilsbury, 7 C. & P. 187, contain, as it seems to us, a needed caution entitled by every judge to the most careful consideration. "It is an extremely painful matter," he said, "for me to decide upon; but when I consider that this species of proof is an anomaly, and contrary to all the rules of evidence, and that if received it would have the greatest weight with the jury, I think I ought not to receive the evidence, unless I feel fully convinced that the deceased was in such a state as to render the evidence clearly admissible. It appears from the evidence, that the deceased said he thought he should not recover, as he was very ill. Now, people often make use of expressions of that kind who have no conviction that their death is near approaching. If the deceased in this case had felt that his end was drawing very near, and that he had no hope of recovering, I should expect him to be saying something of his affairs, and of who was to have his property, or giving some directions as to his funeral, or as to where he would be buried, or that he would have used expressions to his widow purporting that they were soon to be separated by death, or that he would have taken leave of his friends and relations in a way that showed he was convinced that his death was at hand. As nothing of

this sort appears, I think there was not sufficient proof that he was without any hope of recovery, and that I, therefore, ought to reject the evidence."

The case at bar falls short of the least of these requirements. The injury from which the deceased man was suffering was such as to deprive him of consciousness that he was even wounded; it required much effort to convince him of this fact; as he was borne away from the scene of conflict, he charged one of those who was assisting him, and who was endeavoring to minister to his comfort and relief, with having inflicted the injury. From the testimony of Drs. Stanford, Grimes, and other medical men who attended him, it is evident to us that he was at no time in such a condition as to be able to give an intelligent account of the transaction or to enter into any detail, however general, of the circumstances attending it. The only witness who testifies to dying declarations was F. M. Johnson, who was an employé in the Enquirer Sun office, under Wright, the deceased, who was foreman of the office, who was warmly attached to deceased, was with him almost constantly for a week after he received the wound, took an active part in the prosecution of his slayer, and contributed to pay counsel who assisted the solicitor in the trial. It seems somewhat strange that this witness should alone have been selected to testify in this important matter, when there were others presumably better qualified from their education and their relations to the deceased, and who during his entire illness were constantly with him, to ascertain at any given time his fitness to make this statement, and to elicit a fuller account than seems to have been drawn out by Mr. Johnson. The failure to have this examination made by competent and impartial persons, like other omissions already commented on, is well calculated to excite inquiry as to how far the real facts in the case have been brought out, and leaves a painful impression that the court and jury who tried the case, if not groping their way in the dark, were moving in a very un-

certain light. . According to this witness, the deceased was rational only at times during his last illness—was in his opinion rational at the time of making the declaration— gives the facts on which he founds the opinion. The account had better be given in this witness's words, just as they are reported in the record before us.

" He, deceased, asked me to place his hand upon his wound and explain the nature of it, and I did so, and he told me that wound would kill him. I tried to assure him that it would not, and he shook his head and looked off from me. It (the conversation) must have been two or three days after he was shot, probably it might have been one day. I don't remember exactly. Heard him say nothing about it later and nearer his death. Had no opportunity of seeing him; sat up with him the first week, night and day; he was wounded on 2d day of the month and died on the 30th.

" As I said before, he said his wound would kill him; he recognized the fact; was perfectly rational, so far as I could learn; at times he was delirous; you could tell in a moment when he got into that state. He said that he didn't know who shot him; said he was walking along the side-walk and he was shot down. He said it occurred about in front of Holland Mitchell's house. I don't remember that he said exactly in front right there; he remembered getting there; said he heard only one shot, and he said he fainted. I asked him the question and he said he fainted."

On his cross-examination, this witness stated that deceased didn't know that he had been wounded at all, or that he had been shot. He asked in the conversations whether he was wounded or not; he asked, " Am I wounded ?" Said he didn't see anybody shoot him; didn't know who shot him, and didn't know that he was wounded; witness supposes he made these statements to him voluntarily; he was trying to find out who it was; does not remember what he said to him; just simply asked him who shot him. In reply to a question twice repeated, " How

many times did you ask him that before answered?" he said, "He just answered me; it was in the course of conversation, and friendly conversation." "Didn't you know, Mr. Witness, who it was that shot him? Hadn't you heard?" Ans.—"Yes, sir." "Why did you want to get it from him?" Ans.—"Because I wanted to know from him what he knew about it." "It wasn't to learn from him who shot him that you asked the question?" Ans.—"I don't know how I could answer. I knew it from outside reports, from my side, and I wanted to know from his side what he knew about it. I wanted to know." "And he told you he didn't know anything?" Ans.—"Yes, sir." Defendant's counsel objected to these sayings of deceased, meagre and disconnected as they were, and probably wormed out of the wounded man by directly leading questions, suggesting the answer desired by the questioner, and responded to by a monosyllable, yes or no. This we say from the evident reluctance of the witness to give the words of the conversation, when pressed so to do, and from his forgetfulness of particulars. It seems difficult, if not impossible to determine the part that each took in this conversation; or whether this account was made up from the witness's inferences from the conversation or from what was actually said. This affords a very slender foundation for the admission of such testimony. The answers given were fragmentary, and the capacity of the party to make the statement, to say the least, was questionable. It is hardly conceivable that if his physical condition had admitted, he could, from mental inability, have stood an examination conducted in the most cautious and considerate manner upon the stand. His incompetency as a witness, from mental debility, scarcely admits of a doubt. The safer course would have been to exclude these answers thus elicited as dying declarations.

The Supreme Court of Vermont, State vs. Center et al., 35 Verm. R., 378, 386, thus laid down the law upon this subject:

"The rule that dying declarations should point distinctly to the cause of death and the circumstances producing and attending it, is one that should not be relaxed. Declarations, at the best, are uncertain evidence, liable to be misunderstood, imperfectly remembered, and incorrectly related. As to dying declarations there can be no cross-examination. The condition of the declarant, in his extremity, is often unfavorable to clear recollection, and to the giving of a full and complete account of all the particulars which it might be important to know. Hence all vague and indefinite expressions, all language that does not distinctly point to the cause of death, and its attending circumstances, but requires to be aided by inference or supposition, in order to establish facts tending to criminate the respondent, should be held inadmissible." This would seem to be the very spirit of our Code, §3781, when it confines such declarations to "the cause" of the "death" "and the person who killed him." No decision of our court, that we have seen, has ever enlarged the scope of this species of evidence, or in the slightest degree relaxed this most salutary rule. It is not true, as supposed by counsel who argued this case for the state, that this court has left the question of its competency in doubtful cases in some measure to the jury, and to this they cite Campbell's case, 11 *Ga.*, 353, 354, 376, 377; Jackson's case, 56 *Ga.*, 236, 237. Neither of these cases relieves the presiding judge, in any measure, from the responsibility of passing upon the admissibility and competency of the evidence; in submitting to the jury the circumstances under which the declarations were made, whether *in articulo mortis* or not, and it was only designed to provide additional safeguards allowing them to pass upon the credibility of the testimony, and affording them all the considerations necessary for determining its proper weight and effect. This is clear from the cases themselves, but if it were not, it has been rendered plain by the ruling of the court in Dumas' case, 62 *Ga.*, 58, 59, where it is stated in explicit

terms that " the court must judge of the preliminary evi-
dence, in the first instance, and deeming it *prima facie*
sufficient, should admit the declarations, instructing the
jury afterwards to pass finally for themselves on the ques-
tion whether or not the declarations were conscious utter-
ances, in the apprehension and immediate prospect of
death." While we do not hold that the fact of the de-
ceased entertaining and expressing hopes of his recovery
after the alleged declarations were made, or that if the
testimony offered was drawn from him by direct and par-
tial leading questions, and was thus obtained in incomplete
and disconnected parts, which had afterwards to be joined
together, unless he failed to speak intelligently and torpidly
assented to what was said by his questioner, (Wharton's
Crim. Ev., §300, in connection with *Ib.*, §299), would each
of itself be sufficient to exclude them, yet, we think that
when these circumstances are united and combined with
others, such as the want of mental capacity in the declar-
ant, the utter neglect to test his capacity by persons who
were in constant attendance upon him, and who from their
education and profession were skilled and competent to
make the investigation, and instead of these, resort is had
to one utterly unfitted for the purpose, and who, from his
relations to the deceased, took an active part in the prose-
cution and contributed money to employ counsel, thus
showing great bias and partiality to one, if not prejudice
to the other party, we think a case was made throwing
so much doubt and discredit upon these declarations as to
call for their rejection.

The preliminary investigation touching their admissi-
bility and the argument of counsel upon the subject took
place in the presence of the jury, and the court in deciding
to admit them, said he would " instruct the jury as to their
weight in his charge." The instructions given in the
charge on this head were that " dying declarations made
by a person in the article of death, who is conscious of his
condition, as to the cause of his death and the person who

killed him, are admissible in evidence in a prosecution for homicide.   If you believe that the deceased was conscious of the fact that he had been wounded, and that he would die from the wound, and while in that condition he made a declaration or statement as to who wounded him, then you may consider that statement as though it had been given in under oath on the trial of the case.   But if you do not believe from the testimony that he knew, or his mind was impressed with a full sense of his condition, then you should not consider his statement if you should believe that he made a statement prior to his death."

The only circumstances bearing upon the weight of such evidence to which the charge calls attention are the facts of the consciousness of the deceased as to his condition when the statement was made, and his knowledge of the person who inflicted the injury.   The jury are plainly told, if they believed that he knew who killed him, that if he was conscious of the fact that he was wounded, and that he would die from that wound, then they should consider the statement as though it had been given on the trial under oath.   That is, as we understand it, if these conditions appeared, they were to treat the statement just as they would that of a witness who had been regularly sworn and had testified on the trial; that it was in all respects entitled to the same weight as the testimony of such a witness.   No allusion is made to any of the other numerous circumstances which we have seen are essential in determining the weight and effect of such evidence, and in this respect the charge falls far short of the requirements of the law, and was manifestly erroneous.   From its general character and from its want of particularity in this material and essential respect, it was calculated to mislead, rather than to aid the jury in reaching a correct conclusion.

3. Van Cook swore that he was at the house of Mrs. Wright, the mother of deceased, on the Sunday evening before the shooting; that Jesse Wright, the deceased, his

brother and some other persons were there · that he passed by Mitchell's house in going there, and saw some negroes in the yard; didn't know the number, supposed some eight or ten; didn't know whether the negroes were armed or not; was uncertain whether they had guns or sticks. · While at Mrs. Wright's two messages came " from Ben Mitchell to Mr. Wright;" the first was " to come up there —they were ready for him." This was brought by a little white boy whom witness did not know; the second by a little negro boy, likewise unknown to witness, who said " there was a lot of negro men up to Mr. Ben Mitchell's, waiting for Mr. Wright." Of this incident the witness " never thought very much—thought it was probably some business he had, but did not know." This witness was on intimate terms with the Wrights; worked in the same printing office with Jesse. He was pressman, and Jesse foreman. He seems to have been intimately associated with them during most of this difficulty, and his presence on this Sunday afternoon, if casual, as he would represent it to have been, was certainly opportune; not more so, however, than was the interview of Jesse Wright with the policeman Robertson, a short time before the meeting of the parties and the fatal rencontre. The purpose of this was, as stated, to show that Jesse was on a mission of peace; that he was endeavoring to prevent a meeting between his brother and the Mitchells. It consisted entirely of conversations between the witness and Jesse, in the absence of the prisoner, and it was separate and distinct from any conversation which the defense had given in evidence; it was commenced in the presence of Lovick, or as he is sometimes called, " Pierce " Wright. The avowed object was " to head this person off," to prevent him from going to the Mitchells'; if this was really the object, it seems somewhat singular that he was allowed to get away before any effort was made by either of these parties to put this purpose into execution. The defendant's counsel objected to the introduction of the testimony of both

these witnesses, and the objections were overruled. This we think was error. The matters deposed to were *res inter alios acta*, as to the defendant. A portion of the testimony was hearsay. It had the appearance of being a part of a scheme to justify, in advance, an attack meditated upon the Mitchells, and then about to be carried into effect. Parties cannot be allowed thus to fabricate excuses for the commission of an unlawful act. " Statements concocted in advance, as part of a projected scheme of crime   *   * are clearly inadmissible as *self-serving*," and cannot be introduced by the party making them in their own behalf, though they may be put in evidence by the opposite party when the object is to prove " premeditation" and " preparation" on the part of his adversary. Wharton's Cr. Ev., §268 and cases cited. In *Monroe's* case, 5 *Ga.*, 132, Lumpkin, J., said, " If we permit" a party " to manufacture testimony for himself, the most mischievous consequences would often ensue. For how easy it is to feign fears which are not felt, and shape our course in such a way that premeditated revenge, while it gluts itself in the blood of its hapless victim, will refer to the past as proof, not merely of innocence, but of the harassing alarm, from the bondage of which the accused has long groaned to be delivered."

*Carter vs. The State*, 56 *Ga.*, 465, 467, effectually disposes of the objection to that portion of Van Cook's testimony relating to the messages purporting to have been sent by Ben Mitchell to Jesse Wright. It is there declared to be hearsay evidence; the messengers are said to be " competent witnesses," and we hold the only competent witnesses " to prove the messages sent by them" respectively, " if, in fact, such messages were sent." The fact that both these messengers were unknown; that no effort was made to ascertain who they were ; that nothing further than the delivery of these alleged messages appears, casts suspicion upon the *bona fides* of the transaction, and tends to show that it was a mere pretext and device to cover some ulterior design.

These considerations apply with full force to the testimony of Van Cook, in relation to a conversation which took place in front of the Enquirer office between deceased and Holland Mitchell, on the morning of the day of the shooting, at which the defendant was not present and which does not appear to have been communicated to him at any time before his meeting with the deceased. This testimony was properly objected to by the defence, and the objection should have been sustained. This occurred some two hours before the shooting, and was not, as insisted by counsel for the state, a part of the *res gestœ*; it did not lead to the transaction, and was in no way connected with it.

On the other hand, we are of opinion that the testimony of J. D. Edwards, to which objection was made, was part of the *res gestœ*. The witness reached the scene of the conflict in a very few minutes after the deceased fell, and assisted in bearing him away; when they had gotten away thirty or forty steps with him, he asked witness " What did you shoot me for ? " Five minutes would have covered the entire transaction. Not only in this, but in other instances, it was objected that the evidence was not in rebuttal of anything brought out by the defence, and these objections were disallowed. The practice prescribing the order in which testimony shall be introduced is evidently for the convenience of the court, and may be modified as he deems proper to the advancement of the ends of justice; usually a deviation from the established order works no injury to the party objecting, and whether there was error in the fact of its being in rebuttal or not, we are satisfied that it is not a proper subject for revision upon writ of error. 60 Common Rule of Court and cases cited thereunder, Code of 1882, p. 1354.

4. The next subject which we shall consider is the rejection of testimony offered by the defendant upon objections made thereto by the state.

John Peabody, Esquire, was offered to prove what was n to by Rosa Jones, a witness who testified on a *habeas*

*corpus* case to admit Holland Mitchell, charged as accessory before the fact to this homicide, to bail, and who has since then died, and whose testimony was material to the defence set up in this case.   Mr. Peabody was present and heard this evidence; he stated that he remembered some of her testimony and would tell all he could remember.   In reply to a proposition of the solicitor general that if he would state he remembered the substance of the entire testimony, all objection would be withdrawn, he said, after examining a printed paper purporting to give this evidence, which had been handed to him, that he would not now remember what Rosa Jones said, if he had not read the paper; would remember the prominent parts of it; would remember what she said about seeing the shooting; remembers that distinctly; didn't remember hearing her say a part of what he then saw in the paper. Recollects reading the paper the day afterwards; remembers then and now that he thought the testimony was correctly taken down.   It was substantially correct then; remembers now that he did recollect then, that this was correct; but cannot remember now that she testified to all that is stated here; remembers what she stated as to the particulars of the killing.   After reflecting on the matter for a night and refreshing his mind from reading the paper, Mr. Peabody could only repeat that there was in the latter part of the printed account a portion which he now had no remembrance of; that he did not remember the substance of the entire testimony, but did remember the substance of all she said about the shooting.   Here the court said the testimony should be ruled out on the ground that no foundation was laid for its admission.   After some altercation between the counsel, and upon an intimation from the court that Mr. Peabody was misunderstood, the examination was continued, and when he again took the stand, he could not say that he remembered all of her testimony, but remembered the material parts of it, in substance, very distinctly.

In reply to a question propounded by the court as to his recollection of the "substance of her entire testimony as to the particular part about which she testified," he said, "that there were some parts of the cross-examination that he did not remember." The court then said, you can answer that question ; you understand that particular section of the Code (§3782); he answered, he believed he did— believed that he remembered the substance of her testimony. This part of the colloquy between the court, counsel and witness was had while the witness was off the stand. He was then recalled and examined by the judge, and asked if he remembered the substance of the entire testimony to which he replied that he believed he remembered the substance of her testimony. The solicitor general then required the defendant's counsel to propound the statutory question ; the question propounded by counsel was whether he remembered the testimony delivered by Rosa Jones on that trial. This question was objected to ; but pending the objection the witness proceeded to state that he couldn't remember all she said, asked what the question was. The Code was handed him, and he read the section in question; said he understood the ruling of the court was that he must state that he remembered the substance of the entire testimony, and if that was the ruling, he couldn't state that he remembered the substance of the entire testimony; he remembered, however, "very distinctly the substance of the material parts of the testimony." The judge confessed that he did not understand the witness. The witness meant to say, that "the deceased witness testified to some things that he didn't remember, and couldn't say that he remembered the substance of everything that she said, but would testify that he remembered the substance of the material part of her testimony affecting the case, but couldn't say that he remembered the entire substance of all she said ; had no doubt she said a great many things about matters of which he recollected nothing. Defendant's counsel: " No witness

can testify to everything." The court: "No, sir, but you must profess to remember the substance of the entire testimony as to the particular matter about which the witness testifies is necessary. That is the ruling, and the objection is sustained."

The Code (§3782) prescribes these conditions as the foundation for admitting the testimony of a deceased witness; the testimony must have been given on a former trial upon substantially the same issues, and between substantially the same parties; then any one who heard it, and who professes to remember the substance of the entire testimony as to the particular matter about which he is called to testify, is for this purpose a competent witness, as was held by this court in 61 *Ga.*, 444, 448; 64 *Ib.*, 492, 493. Indeed, this is the rule laid down by the judge in this case, but which we think he enforced too rigidly, if he did not misapply it. A substantial and not a literal compliance with these conditions is all that we think is required. To insist upon a literal compliance would be to subject the person professing an ability to swear to all that was testified to in a case, instead of the substance of the entire testimony upon a particular matter, to much suspicion. Few, if any, scrupulously exact persons could be found to place themselves in such a position, and the result would be that parties would have to resort to those less honest and conscientious, or lose entirely the right thus accorded them. 27 *Ga.*, 527, 528. When Mr. Peabody, at the end of this long and searching examination, stated that he remembered " the substance of the material part of this dead witness's testimony affecting this case," he qualified himself to give evidence as to that particular matter, and the court erred in rejecting him. It is plain to us that, as to everything essential to this issue, as testified to by the witness on the former trial, the court and jury would have received from this scrupulous witness as full and impartial an account, aided as he was by a cotemporaneous report of the testimony, as can usually be hoped for. Although

v 71-11

asked to do so, the court seems to have declined to look to this paper and ascertain what part of the account there given was material and what was immaterial, and how far the witness could bring himself within the rule rendering him competent. That a substantial compliance with these conditions is all that has been deemed necessary, is abundantly shown by various rulings of this court upon strictly analogous questions. The Code evidently contemplates that the witness shall testify from his own memory, as for instance, where testimony has been taken down on a former trial, or a brief has been agreed upon for the purposes of a motion for a new trial, there the written has been received in lieu of the oral evidence of one present at former trial. See this entire subject reviewed in *Smith vs. The State*, at this term of the court. In view of the well settled rule that penal laws are to be strictly construed in favor of the life or liberty of the accused, and that as against the state, in furtherance of the same benignant and merciful purpose, they are to be so interpreted as to have all the temperament of justice and equity of which they are fairly susceptible, not incompatible with the safety of the community. We conclude that the testimony of this witness should have been received. To say the very least, his competency was no more than doubtful, and in all such cases the well established practice is to admit the evidence, and allow the jury to pass upon the circumstances affecting its competency in determining its credibility and weight.

5. The defendant offered to prove, by Joseph Evans and Maria Sturkey, the acts and threats of Lovick P. Wright, on the day before and on the morning of the shooting, in reference to Ben Mitchell. This evidence was offered for two purposes: to show, with other facts in evidence, the combination and conspiracy of the Wrights to assail and kill prisoner, and to show that the prisoner acted under the fears of a reasonable man; both these were prominent and important issues on the trial. The testimony was rejected because these special acts and declarations were

not communicated to prisoner and were not in the presence of the deceased. Acts and threats of like character had been communicated to and done in the presence of the prisoner; this warfare had been waged for several days; several visits were made to prisoner's home and that of his brother; the Wrights throughout this series of aggressions seem to have acted in concert; and under the rulings in *Monroe's* case, 5 *Ga.*, 85, this testimony was admissible to explain prisoner's conduct and account for the motive with which he ultimately acted. The testimony of the other witnesses objected to and refused than this already noticed and commented, was properly rejected.

6. When Reynolds, a witness for the state, was on the stand, he was asked on cross-examination,. " Well, if you did so testify, it is the truth?" The court, on objection made, interposed with a mild reproof, saying he " didn't think it proper to ask a witness whether he did swear to the truth, the law is whether he swore to what he believed to be true—think it an improper question put in that way." To this objection was taken, because the question in itself was proper, it being alleged, that he then gave a different account of the transaction inquired about, when his memory was fresh, than that now given, and because it was an unwarrantable interference by the court with the cross-examination. It is unquestionably true, that the right of " a thorough and sifting cross examination " of the witnesses called against him belongs to every party. Code, §3864. Wherever the purpose is to impeach or discredit the witness, which we suppose was the case here, although it may not have been avowed, and was very properly held back, as the avowal might have defeated the object in view, " great latitude should be allowed by the court " in cross-examinations. 31 *Ga.*, 688, 692.

7. Lastly, the court was requested by defendant's counsel in writing to charge the jury, " If they had a reasonable doubt as to whether Ben Mitchell acted, when he shot, under circumstances calculated to excite the fears of a

reasonable man, or whether he felt at the time he shot, and had reason to feel from the circumstances, that it was necessary to shoot to save his life, limb or person, then he was justifiable." This request was refused because, as the judge stated, it was substantially given in his general charge. The general charge as to doubt does not specially refer to the points here made, as to reasonable fears, neither does the charge as to circumstances which excite the fears of a reasonable man allude in the remotest degree to the effect of doubt upon this point, and if there is any other portion of the charge that covers it, we have failed to find it. The charge was apposite and proper, and should have been given as requested.

We again repeat that we have not intimated an opinion as to what should be the finding on another trial of this case. For obvious reasons, it would be improper to do so. When the case is heard again, we cannot anticipate that the verdict will be otherwise than the law and testimony fully and fairly given in charge will warrant.

For the reasons above set forth, and for none others, the judgment of the court below refusing a new trial must be set aside.

Judgment reversed.